[Civ. No. 31557. Fourth Dist., Div. One. May 24, 1985.]

PATRICK MAHONEY, Plaintiff and Appellant, v.
BOARD OF TRUSTEES OF SAN DIEGO COMMUNITY COLLEGE
DISTRICT et al., Defendants and Respondents.

COUNSEL

Frank L. Asaro, Arnold Neves, Jr., and Asaro & Keagy for Plaintiff and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Howard P. Brody, Chief Deputy County Counsel, Arlene Prater and Desiree Anketell, Deputy County Counsel, for Defendants and Respondents.

OPINION

WIENER, J.—Patrick Mahoney appeals the denial of his petition for writ of mandate for reinstatement with the San Diego Community College District in his tenured position as instructor of data processing at San Diego City College. We reverse with instructions to the trial court to issue the writ of mandate.

### FACTUAL AND PROCEDURAL BACKGROUND

Mahoney's petition was denied without any evidentiary hearing at which the trial court could hear live testimony directed to the various disputed factual issues in this case. We are thus presented with a situation in which the trial court was asked to make contested factual findings from a cold record consisting of declarations and depositions of the parties and various other individuals. We recently had occasion to note that this type of fact-finding by the trial court presents serious conceptual problems (see *Hurtado*

v. *Statewide Home Loan Co.* (1985) 167 Cal.App.3d 1019, 1026, fn. 5 [213 Cal.Rptr. 712]) to the point that some courts have argued the appellate court is in no worse position than the trial court to "find" the disputed facts. (See *United Farm Workers National Union* v. *International Brotherhood of Teamsters* (1978) 87 Cal.App.3d 225, 233 [150 Cal.Rptr. 761].) The situation is further complicated here because, given the theory of decision adopted by the trial court, it is unclear what, if any, factual findings were made.

Fortunately, we need not resolve the thorny problem of a trial court finding from a cold record because we have concluded that even if we accept all the factual contentions proffered by the San Diego Community College District (hereafter District), Mahoney is nonetheless entitled to a writ of mandate directing his reinstatement. While we will assume a set of facts consistent with the District's position, we nonetheless find it appropriate for contextual purposes to summarize the relevant declaration and deposition testimony.

On July 6, 1983, Dr. Cecil J. Hannan, director of administrative services and personnel for the District, met with full-time permanent certificated instructor, Patrick Mahoney, to discuss the resignation of Marjorie Leeson, another data processing instructor. At the meeting, Hannan and Mahoney discussed Leeson's letter of resignation which Hannan believed contained misstatements of fact attributable to Mahoney. Hannan asked Mahoney why he gave Leeson the wrong information. He told Mahoney the erroneous information contributed to her resignation and said "maybe the wrong person has resigned here."[1] Hannan agreed to contact Leeson to try to convince her to change her mind regarding her resignation. Hannan was not speaking in a loud voice during this meeting. Although he viewed Mahoney as a "high-strung" person, and although both he and Mahoney were concerned over Leeson's resignation, Hannan saw nothing out of the ordinary in Mahoney's behavior during the meeting.

The following day, Mahoney dictated a letter of resignation to Hannan's secretary by telephone: "I appreciate your understanding and support over the years. After a great deal of thought *I have decided to accept your recommendation and resign my instructor position with the District.* (Emphasis added.)

---

[1] In his later declaration, Hannan stated he "did *not* recommend to Mr. Mahoney that he resign from his position with the District."

"I am saddened and sorry to have caused so many problems and to have been so unproductive at City College. I have really tried."[2] Hannan's secretary read the dictated message back to Mahoney who made no changes in the message.[3] Mahoney never signed the message, however, and at the time of his deposition Hannan did not know if Mahoney ever saw the message.

After making contact with Leeson, Hannan tried as many as 15 times to contact Mahoney at his residence and at his office to report on his conversation with Leeson and to discuss Mahoney's resignation. When Hannan called Mahoney's office, he got no answer. There was no way for Hannan to leave Mahoney a message at the college. At the time of his deposition, Hannan stated he did not consider writing Mahoney a letter at his home to confirm his resignation.

Hannan thereafter called Dr. Allen Repashy, President and Site Administrator of San Diego City College, and told him Mahoney had resigned. Repashy was surprised and asked Hannan why Mahoney had resigned. Hannan told Repashy he thought it had something to do with the lady they had hired who had only taught for about two months and resigned. Hannan could not recall the date of this conversation. On a subsequent occasion, Hannan again spoke with Repashy. Repashy told Hannan he had seen Mahoney and had said, "[H]eard [you] resigned" to which Mahoney replied "no." Hannan did not recall the date of this conversation. Hannan took no action to clarify the meaning of Mahoney's statement to Repashy that he was still teaching, because Hannan didn't know if Mahoney referred to his full-time tenured position or his additional part-time position.[4] Meanwhile the San Diego Community College District Personnel Office processed the routine papers to put Mahoney's resignation on the Board of Trustee's (Board) agenda for approval.

On July 27, 1983, the Board approved Mahoney's resignation. No document accompanied the Board docket regarding Mahoney's resignation. The

---

[2]Ramona J. Richardson, instructor in the data processing department at city college and chairperson of that department as of December 1983 stated in her declaration that on July 8, 1983, she was in the computer laboratory at city college and saw Patrick Mahoney who told her he was resigning. Richardson stated she was not surprised to hear this because Mahoney had expressed dissatisfaction with his job during the previous several months.

[3]In her declaration, Dorothy M. Williams, administrative secretary in the office of administrative services and personnel, stated Mahoney dictated his statement to her which she took down verbatim. She stated that after Mahoney completed the statement, she read it back to him, word for word, as she had taken it down. She noted she routinely did this to insure the accuracy of dictation. She said Mahoney made no changes or comments to what she read him. Immediately after her conversation with Mahoney, she typed the statement, verbatim, as dictated by Mahoney.

[4]Mahoney taught one course at San Diego City College on a part-time basis in addition to his full-time course load.

Board knew nothing of how Mahoney's resignation was made and there was no discussion by the Board prior to its approval of the resignation.[5]

Sometime after July 27 Hannan met with Mahoney in Hannan's outer office and Mahoney expressed surprise over the Board's action. Hannan asked Mahoney: "Didn't you mean to resign?" to which Mahoney replied "no." Mahoney told Hannan he never intended to resign. Hannan told Mahoney he would have to check with county counsel. Hannan checked with county counsel, told Mahoney that to withdraw his resignation he must write a letter withdrawing his resignation and request reinstatement, and asked Mahoney to do that. Mahoney wrote the following letter which Hannan had reviewed by county counsel: "I was quite surprised to learn this afternoon that the Board had taken resignation action concerning me since I have never resigned nor intended to resign my position with the District. Any communications with your secretary were not intended as a resignation. I request that the Board immediately set aside its action. Please advise me when this matter has been resolved. Thank you for your assistance." Hannan believed Mahoney's letter did not do what was necessary in order to legally seek withdrawal of the Board's action. He did not take the letter to the Board but discussed it with the chancellor who said to proceed and let the courts have their say.

On August 2, Hannan replied to Mahoney's letter and said: "Your statement that you never resigned or intended to resign does not square with the facts.

". . . . . . . . . . . . . . . . . . . . . . . .

"Since you continue to maintain that you have not resigned, I have turned the matter over to County Counsel.

". . . . . . . . . . . . . . . . . . . . . . . .

"It is the District's contention that you submitted an unequivocal resignation." Hannan spoke on behalf of the District in his capacity as director of personnel when he stated the District's position.

On August 10, 1983, the Board again approved Mahoney's resignation. Hannan could not explain why Mahoney's name appeared twice on the Board's docket but found it not unusual for a name to appear twice. Eventually, Hannan did discuss the dispute over Mahoney's resignation with the Board in closed session but he didn't recall when.

---

[5]As part of his regular duties, Hannan and his staff planned agendas and dockets for closed sessions of the Board and coordinated them with the chancellor of the District.

According to Hannan, there was no typical resignation process in the San Diego Community College District. Although unable to recall any instance in which a tenured teacher resigned orally, Hannan stated sometimes resignations were made orally. There was more than one form in the District for written resignations, but sometimes a letter of resignation was used. Although the personnel office had a resignation form, the District had no requirement that this form be used.

Repashy confirmed Hannan's testimony that Repashy learned of Mahoney's resignation from Hannan by telephone. He recalled seeing Mahoney before his vacation, which began July 16, 1983. Repashy described his conversation with Mahoney as not "very big." Repashy informed Mahoney he had intended to place a letter of reprimand in Mahoney's file regarding Leeson's resignation but found it unnecessary since Mahoney had resigned. Mahoney told Repashy he had the wrong information. Repashy didn't remember if he asked Mahoney to submit written resignation forms. Repashy didn't give a second thought to Mahoney's statement that Repashy's information was wrong. In his memory, Mahoney had not said "I haven't resigned." Nor did it bother Repashy much that the information he received from Hannan didn't jibe with Mahoney's statement. Repashy viewed the issue as a District issue.

Repashy testified there was an established, typical resignation procedure for employees of city college. The resigning employee met with the dean of the school. At that meeting, resignation forms were "initiated" and signed, passed on to Repashy, who also signed them, and then passed on to the personnel department. The form used included the name of the employee resigning, the effective date of resignation, the reasons for resignation and the employee's signature. Repashy always processed resignations in this way and he believed they had been done that way before he came to the college. Repashy never processed the resignation of any certificated permanent employee orally.[6]

Although Mahoney's deposition testimony agreed with Hannan's testimony in some respects and added to it in other respects, Mahoney disputed Hannan's version of the facts in several significant ways.

Mahoney explained he arranged the July 6 meeting with Hannan after receiving from Leeson a copy of her letter of resignation. Mahoney was concerned and upset over the loss of Leeson. Leeson had a national repu-

---

[6]Apparently due to the inconsistency between Hannan's and Repashy's deposition testimony, Repashy's later declaration said his understanding of the resignation process was not in conformity with District resignation policy and procedure.

tation in data processing, had written five major text books, had twenty years of college teaching experience and significant administrative experience. Mahoney's concern over Leeson's resignation was intensified because the data processing department had lost 75 percent of its contract instruction staff at the end of that semester leaving Mahoney as the only full-time instructor from the previous staff. He intended to ask Hannan to contact Leeson and request she reconsider her decision to resign.

According to Mahoney, Hannan shouted at him and accused him of poisoning Leeson's mind. Hannan said Leeson's letter of resignation was written in Mahoney's words, not Leeson's, that her complaints about the data processing department were Mahoney's complaints, and that her resignation was Mahoney's fault and responsibility. Hannan then told Mahoney he should quit so that the District could hire some good teachers. Mahoney considered Hannan's words a strong recommendation he resign. Mahoney attempted to show Hannan documentation, in the form of memos from the college dean and president, of the points Leeson made in her letter of resignation. Hannan refused to look at it. Mahoney discovered in his meeting with Hannan, however, that major advances to rectify what Mahoney viewed as the problems of the data processing department had been made. In his opinion, the tone of the meeting with Hannan was productive and professional at the end and Hannan offered to help contact Leeson.

Nonetheless, Mahoney was disturbed and upset after the meeting and concerned about himself, Hannan's reaction at the meeting, and the data processing program. He did not sleep the night of July 6 nor did he eat the morning of July 7.

Mahoney called Hannan's office on July 7 to find out what happened when Hannan contacted Leeson. Mahoney had given a lot of thought to their July 6 meeting and felt if he were in fact responsible for Leeson's resignation, he should resign.

Since Hannan wasn't in, Mahoney spoke with Hannan's secretary. Mahoney didn't recall exactly what was said. He was "quite distressed and upset and still in shock over the situations that had unfolded the previous day." He thanked the secretary for squeezing him into Hannan's schedule the previous day and left a message for Hannan that if he were responsible for Leeson's resignation, he would leave also. Mahoney assumed Hannan would contact him. In his deposition, Mahoney stated that he at no time intended his message to be a resignation or told the secretary his message was his resignation, nor did he consider his conversation with her a resig-

nation.[7] On the contrary, Mahoney knew the resignation process from an associate who had recently resigned and knew that process did not encompass oral resignations.

According to Mahoney, he heard nothing from Hannan thereafter although he was in town teaching a course, was on campus Monday through Thursday of these weeks, had an answering machine in his office, and had messages taken at the switchboard in the apartment where he lived. Mahoney explained he saw no reason to try to contact Hannan again because Mahoney had been able to contact Leeson himself. She assured him he had not influenced her to resign[8] and agreed to reconsider her resignation.[9]

On July 13, or 14, 1983, Mahoney was teaching in the classroom next door to the president's office. While his students took a short exam, Mahoney saw Repashy, who said he wanted to speak to Mahoney. They walked outside the building and spoke for several minutes. Repashy told Mahoney he held him responsible for Leeson's resignation and had considered putting a letter of reprimand in his file. He said he understood Mahoney was resigning from the college and he should fill out resignation forms. Mahoney told Repashy he had not resigned and did not intend to resign. After this conversation with Repashy, Mahoney had no idea Hannan's office thought he had resigned. He thought the matter had been cleared up. His assumption was based on his familiarity with the city college resignation process which Mahoney acquired the previous semester when his colleague and office mate, John Burd, resigned from the data processing department.[10] He also

---

[7]When asked if the message Williams typed (see *ante,* pp. 792-793) was an accurate statement of what he said, Mahoney replied: "I think I cannot testify that that is not an accurate statement of part of what I have said. It's not a complete statement of the conversation which I had with the secretary. I don't remember . . . the exact words of what was said."

[8]Leeson's declaration clearly states her resignation was not caused by any statements of Mahoney. "Any assertions that my resignation was prompted by statements made to me by Mr. Mahoney or that Mr. Mahoney gave me inaccurate or misinformation are not true."

[9]On July 10, Leeson wrote the dean affirming her resignation. Thereafter, there was no hope of getting Leeson back. Since Hannan had the same information Mahoney had regarding Leeson's resignation, Mahoney saw no reason to contact Hannan further.

[10]We take judicial notice of the declaration of John B. Burd, filed in the superior court file on Mahoney's petition and considered by the superior court in reaching its decision on the writ. (Evid. Code, § 459, subd. (a) and § 452, subd. (d).) John Burd was also a data processing instructor at San Diego City College. During February and March of 1983, Mahoney and Burd discussed staffing needs for the data processing instructional program with Mr. McCauley, Dean of the College of Business. In the course of those discussions, McCauley told Burd and Mahoney no official action on a retirement or resignation could be taken until the appropriate district retirement or resignation forms were complete and signed by the person involved. In April of 1983 Burd himself decided to resign. He submitted a written letter of resignation to Dr. Repashy. Thereafter, he received a telephone call from Repashy's secretary who stated that the resignation letter was not sufficient. She further stated he must complete and sign the appropriate district resignation forms in order for his

knew the resignation process from Leeson's resignation. A California Teacher's Association representative told Mahoney the normal process was for resignations to be in writing.

When Mahoney arrived at City College campus midmorning August 1, 1983, his then office mate told Mahoney he was sorry to hear he had resigned. Since his office mate heard of Mahoney's resignation from Dean McCauley, Mahoney went immediately to the dean's office. McCauley told Mahoney he heard of his resignation from personnel and that the Board had approved it. McCauley had not previously known anything of Mahoney's resignation. Mahoney was completely flabbergasted. He told McCauley he had not intended to resign and had not resigned. McCauley suggested Mahoney call Hannan.

When Mahoney called Hannan, he told him he was surprised to find the Board had acted on his resignation since he had not resigned or intended to resign. Hannan told Mahoney to put it in writing. Mahoney wrote Hannan that day. Mahoney received his first written notice of resignation on August 2 from Hannan in response to his letter of August 1.[11]

Thereafter Mahoney filed a petition for writ of mandate to order the Board to reinstate him as a full-time certificated employee. As we explain in our discussion below, we reject the rationale on which the court relied in denying the writ. We conclude that even had the court resolved all disputed facts in favor of the District, Mahoney's reinstatement is nonetheless mandated.

DISCUSSION

I

■ The court below denied Mahoney's writ on a theory of ratification, reasoning Hannan as director of personnel was an agent of the corporate

---

resignation to be accepted. Repashy confirmed Burd's conversation with the secretary. Thereafter Burd filled out and returned to the district office the requisite resignation forms. Although there was some difficulty in the forms reaching the district office, they were eventually received and Burd's resignation was processed. Mahoney, as Burd's office mate, was aware of the resignation process Burd underwent.

[11]At Mahoney's deposition, Mahoney was shown a copy of a letter written by Hannan, dated July 8, 1983, confirming Mahoney's telephone resignation. Neither Mahoney nor his attorney had previously seen the letter in spite of discovery requests for all papers relevant to Mahoney's resignation. Hannan's secretary's initials did not appear on the letter which was addressed to the address of one of Mahoney's friends with whom Mahoney had stayed briefly when he changed apartments years earlier. Mahoney had since received mail at that address from time to time but he had received mail from the District at his current address. The receipt for the letter was signed by E. Cannady who Mahoney did not know. Deputy county counsel who conducted Mahoney's deposition found the copy of the letter in Mahoney's personnel file.

board properly authorized to accept resignations on its behalf. Under this theory, since Mahoney did not withdraw his resignation before Hannan accepted it by his July 7 letter of confirmation, Mahoney was precluded from retracting it thereafter as long as the Board ratified Hannan's action as it did on July 27 and August 10, 1983.

Education Code section 87730 imposes on boards of community college districts the affirmative duty to accept resignations of employees. Although it has been suggested that the ministerial aspect of this duty may be delegated (see *American Federation of Teachers* v. *Board of Education* (1980) 107 Cal.App.3d 829, 837-838 [166 Cal.Rptr. 89]), we need not resolve that question in the present case since the Board had no written delegation policy authorizing the director of personnel to officially accept the resignations of employees and describing the procedures and setting the time of acceptance for handling resignations. (See *American Federation of Teachers, supra,* 107 Cal.App.3d at p. 838.) Thus, neither Mahoney nor any other employee of the District could reasonably be put on notice thereof. Without a codified policy of delegation, Hannan could not officially accept Mahoney's resignation so as to preclude its withdrawal before the Board voted its acceptance.[12]

## II

The District nonetheless contends that even if Hannan could not validly accept Mahoney's resignation, the Board accepted his resignation at its July 27 meeting. Mahoney responds it is undisputed that before July 16 he had communicated with Repashy and made it clear he did not intend to resign.

Resignations are contractual in nature. (*American Federation of Teachers* v. *Board of Education, supra,* 107 Cal.App.3d at p. 835.) As such, a resignation is an offer which may be withdrawn prior to its acceptance. (*Id.,* at p. 840; *Armistead* v. *State Personnel Board* (1978) 22 Cal.3d 198, 201, 206 [149 Cal.Rptr. 1, 583 P.2d 744].) The District has consistently attempted to suggest a difference between a withdrawal of a resignation and Ma-

---

[12]Even if Hannan were authorized to accept resignations, a provision in the applicable collective bargaining agreement governing certificated personnel would appear to preclude his doing so for 10 days. The agreement provides that a contract faculty member who submits a written resignation under stress or duress may withdraw the resignation without prejudice within 10 work days following the date the resignation is submitted. While the District contends the provision is inapplicable because Mahoney's resignation was oral rather than written, we can conceive of no reason why an oral resignation under stress should not be withdrawable where a written one is. Rather, we think the explicit mention of a "written" resignation lends support to Mahoney's contention that it was generally understood all resignations would be in writing. (See *post,* pp. 800-801.)

honey's statements constituting a disavowal of a resignation. We are unpersuaded. Repashy testified that Mahoney told him prior to July 16 his information Mahoney resigned was wrong. (*Ante,* p. 795.) That information was communicated to Hannan yet he did not contact Mahoney to clarify the situation. Hannan's lack of concern is particularly surprising in view of the fact that Mahoney's supposed resignation was not communicated directly to him but only via a telephone message.[13] Hannan had not successfully verified the message. Furthermore, Hannan then chose to present the resignation to the Board for its acceptance without any mention of Mahoney's contradictory communication with Repashy. Finally, we are unable to understand why Hannan chose not to present Mahoney's letter (*ante,* p. 794) to the Board for its consideration. Hannan was certainly entitled to inform the Board of his belief that the letter was ineffective as a withdrawal, but the Board should at least have been alerted to Mahoney's position.

Accordingly, to the extent Mahoney's message to Hannan's secretary constituted an effective resignation (see *post*), we conclude it was effectively withdrawn prior to the Board's purported acceptance on July 27.

### III

■ Whether Mahoney effectively withdrew his resignation of course assumes there was a resignation to withdraw. Mahoney repeatedly testified to his belief that the telephone message he left with Hannan's secretary was not a resignation because the District had a policy requiring that resignations be in writing. We conclude the uncontested facts on this issue preclude the District from treating the telephone message as a formal resignation.

Mahoney's understanding of the District's resignation procedures was based on his familiarity with the resignations of John Burd and Marjorie Leeson. Leeson's declaration confirms Mahoney's understanding. Her letter of resignation directed to the dean of her department was insufficient to resign.[14] Burd's experience was similar. (*Ante,* fn. 10.)

---

[13]In this context, we find it disturbing that, at his deposition, Hannan did not recall considering writing Mahoney a letter verifying the telephone message of resignation. At Mahoney's deposition, a copy of a letter verifying the resignation message was produced. It was addressed, however, to an address where Mahoney had lived only briefly, years previously, and it was sent to this address in spite of the fact Mahoney had been receiving District mail at his current address. The form verifying receipt of the registered letter was not signed by Mahoney. Hannan claimed to have unsuccessfully attempted to contact Mahoney by phone both at his residence and office. Yet Mahoney testified he had an answering machine at his office and he was on campus Monday through Thursday during the period in question..

[14]The dean informed Leeson that in order to resign she had to complete and file district resignation forms. Even her second letter of resignation to the same dean was insufficient to resign. Leeson ultimately received in the mail district resignation forms which she thereafter completed, signed and returned.

Even more telling was Repashy's deposition testimony demonstrating that even the president of the college understood that District policy required resignations to be in writing. (*Ante,* p. 795.) Although his later declaration explained that his understanding was a mistake,[15] it is his initial understanding which is critical. ■ Where top level administrative personnel represent to employees that a certain procedure exists, we believe a government employer should be equitably estopped from denying the existence of the procedure in cases where employees reasonably rely on it.[16]

■ That Mahoney did not raise this argument below is no bar to our consideration of it. The relevant evidence on which it is based was not a matter of dispute below. Neither Hannan nor Repashy questioned whether Mahoney had the impressions he claimed. They challenged only the accuracy of his impressions. (See *City of Newport Beach* v. *Sasse* (1970) 9 Cal.App.3d 803, 812 [88 Cal.Rptr. 476].)

## IV

■ Reading between the lines, we suspect Mahoney's surprise resignation was viewed by the District's administration as a fortuitous opportunity which should be taken advantage of. While a critical faculty member may be viewed as uncooperative and undesirable from an administrative standpoint,[17] and while such qualities may in some circumstances make a resignation particularly welcome or even warrant dismissal, the District must follow due process and honor its legal responsibilities in achieving either.

## DISPOSITION

Reversed with instructions to the superior court to issue a writ of mandate compelling Mahoney's reinstatement and to conduct such further proceed-

---

[15]Hannan asserted, after a study of his records, that he processed 15 resignations a year and, since Repashy averaged only 5 resignations per year, the remaining 10 must have been oral. Hannan's latter statement need not follow from the former; but even if it did, it would not change the impression Mahoney justifiably drew based on the procedures for resignation his colleagues were required to follow.

[16]Mahoney's assumptions regarding the District's resignation procedure might also be viewed as a material mistake of fact on which his resignation was based. He made his oral statement to Hannan's secretary based on his belief the District would not accept an oral resignation. A mistake of fact as to the nature of the transaction violates the mutual assent required to make an offer of resignation effective. (*Odorizzi* v. *Bloomfield School Dist.* (1966) 246 Cal.App.2d 123, 130 [54 Cal.Rptr. 533].)

[17]Comments from Hannan, Repashy, Mahoney, Leeson and Richardson made clear that Mahoney was critical of administration of the college and the District with respect to their administration of the data processing department.

ings as are necessary to determine what additional remedies are appropriate.

Staniforth, Acting P. J., and Butler, J., concurred.