[No. B163469. Second Dist., Div. One. Jan. 6, 2004.]

EMMA CORPORATION, Plaintiff and Respondent, v.
INGLEWOOD UNIFIED SCHOOL DISTRICT, Defendant and Appellant.

## COUNSEL

Orbach & Huff, David M. Orbach, Howard B. Brown and Lorraine A. Middleton for Defendant and Appellant.

Monteleone & McCrory, Patrick J. Duffy, G. Robert Hale and Shannon M. Kozak for Plaintiff and Respondent.

OPINION

**ORTEGA, J.**—Emma Corporation, a licensed building contractor, submitted the low bid on a school construction project proposed by the Inglewood Unified School District. (Pub. Contract Code, § 100 et seq.; all further section references are to the Public Contract Code.) As required, Emma included a bond issued by Fidelity and Deposit Company of Maryland for 10 percent of the bid, which would be forfeited if Emma won the contract but refused to perform.

Emma discovered it had failed to include its plumbing subcontractor's costs in its bid, which thus was nearly $800,000 too low. Emma timely sent the District a letter withdrawing its bid. The District, but not Emma, realized the letter did not provide all the information required by, and thus did not satisfy, the bid withdrawal statutes. (§§ 5101–5103.) As part of a deliberate strategy, the District told Emma it would contact Emma if it needed more information. The District did not do so. When the bid withdrawal period lapsed, the District claimed Emma failed to comply with the bid withdrawal requirements and awarded Emma the contract at its original bid price.

Emma refused to perform. The District gave the contract to the next lowest bidder. Emma sued the District for rescission and exoneration of the bond. The District cross-complained for contract breach, seeking the difference between Emma's and the next lowest bid, and payment of the bond.

The parties agreed to sever the trial of the complaint from trial of the cross-complaint, and to waive jury. On trial of the complaint, the trial court found Emma failed to substantially comply with the bid withdrawal statutes. However, the court found the District's conduct in response to Emma's attempted bid withdrawal estopped the District from enforcing the contract. The trial court entered judgment for Emma and dismissed the cross-complaint with prejudice as moot. The District appeals.

The District contends that on the facts found by the trial court it cannot be estopped as a matter of law because on these facts, it is immune from estoppel. We reject the contention and affirm the judgment.

## FACTS

The District does not challenge the sufficiency of the evidence. Indeed, in the standard of review section of its brief, the District argues the standard of review is de novo "[w]hen the facts are undisputed . . . . As will be established

below, the facts are undisputed." As a result, we quote the facts and conclusions found by the trial court from its statement of decision.[1]

"On November 14, 2001, [Emma] . . . entered a sealed bid to the . . . District . . . for the new construction and modernization of the Frank D. Parent Elementary School project . . . . [Emma]'s bid was in a lump sum amount of $8,150,000.00 and was the apparent lowest bid in price submitted on November 14, 2001; FTR International submitted the apparent next lowest bid, a bid of $9,100,000.00. Execution of a contract pursuant to [Emma]'s bid if tendered was guaranteed by an $815,000.00 bid bond executed for ten percent (10%) of the amount bid and submitted with [Emma]'s bid.

"Bids for the Parent project had been previously taken on October 22, 2001, at which time the only bidder, DJ Amoroso, timely entered a bid in the sum of $10,909,000.00. The amount of the bid by DJ Amoroso exceeded the amount of money available to the District to pay for the new construction and modernization of the Parent project. [The District's budget for the Parent project was only $6,968,445.00 . . . ]. The District subsequently elected to reject the bid by DJ Amoroso and re-advertise the bid on the Parent project. After this first bid in October, 2001, the District was very concerned about its ability to obtain, on a re-bid of the Parent project, a bid sufficiently close to the District's budget to allow the new construction and modernization to take place. Accordingly, the District undertook various actions to obtain lower bids on the re-bid of [the] Parent project, including not answering Emma's inquiries as to the amount of the DJ Amoroso bid when it was requested prior to the second Parent school bid date.

"When [Emma] entered its bid of $8,150,000.00 on November, 14, 2001, for the Parent project, [Emma] did so as a result of having committed a clerical error when adding up the sub-items within its total cost estimate, thereby causing [Emma] to bid an amount $786,000.00 less than [Emma] would have bid if it had not made the mistake. Specifically, the bid for the plumbing and site utilities work by subcontractor Estep & Sons . . . in the amount of [] $786,000.00, was included in [Emma]'s estimated costs for the Parent project at only $2.00 rather than $786,000.00. This is reflected in [Emma]'s cost estimate spreadsheet from which [Emma] totaled its bid for the Parent project . . . . The mistake occurred because [Emma]'s estimator, Nadine Dumindin, erroneously entered a figure 1 as if it were a bid amount on both the lines for site utilities work and plumbing work when she intended to enter a 1 in only the line for site utilities work.

---

[1] Periodically in its brief, the District suggests it did not act as the trial court found, and suggests that we reject the trial court's factual findings. Because of the District's express concession that it is not challenging the evidence, we reject these contradictory assertions.

"At the time of the second bid opening for the Parent project on November 14, 2001, Charles Clements was an employee of CMTS, Inc. CMTS, Inc. was then the District's construction management company for the modernization and new construction for . . . projects which included the Parent project. Mr. Clements was then designated senior project manager for the Parent project, and agent for receipt and evaluation of bids for the project and for over-all management of subsequent performance of the work []. Also at that time, Tom Jeffries, another employee of CMTS, was designated as the direct on-site project manager for the Parent project. Immediately after the bids for the Parent project were opened on November 14, 2001, Mr. Clements recognized that the bid price entered by [Emma] was so far below the prices of other bidders, including FTR International, DJ Amoroso and Morillo (whose bids were tightly bunched) . . . that [Emma]'s bid likely contained a material mistake and that [Emma] would likely seek to rescind its bid under Section 5103 . . . for such mistake. Directly after the bid opening at the offices of the District where the bids were entered and opened, Mr. Clements expressed his opinions to, among others, Jerry Norman, interim facilities director for the District, and David Orbach, outside legal counsel to the District.

"At that time just after the bid opening on November 14, 2001, the District's agents, including Mr. Orbach, Mr. Clements, and Mr. Norman, knew that the technical requirements for rescission under Section 5103 . . . were complex and that a bidding contractor might fail in complying with the technical requirements when withdrawing its bid for mistake. Accordingly, the District's agents set out a plan of action aimed at maximizing the likelihood that [Emma] would, in fact, fail to meet the technical requirements of . . . Section 5103. The District's agents determined that: no agent or employee of the District would assist [Emma] in rescinding its mistaken bid; the District's agents and employees would decline to react to any withdrawal notification by [Emma], written or oral; the District's agents or employees would not answer or react to any question by [Emma] about the bid withdrawal process and, instead, would refer all inquiries to the outside legal counsel for the District. Mr. Orbach gave such directions to those agents and employees of the District who were present after the bid opening. On the following Monday, November 19, 2001, Mr. Norman gave such directions to agents and employees of the District who were not present at the prior meeting.

"On November 16, 2001, [Emma] sent by facsimile to the District a bid withdrawal letter . . . which notified the District that [Emma] had made a clerical error in totaling its bid price and that [Emma] wanted to withdraw its bid for such mistake. The letter, however, failed to describe all the details about how [Emma]'s mistake occurred. The District did not reply to [Emma]'s letter at any time but, eventually, the District purportedly awarded the

contract for the Parent project to [Emma] and delivered the same to [Emma] without prior notice. Also without notice to [Emma], the District met in executive session of its Board of Education and determined that the District would refuse to allow [Emma] to withdraw its bid. The Board of Education based its decision on the opinion of the District's legal counsel . . . that [Emma]'s letter, submitted on November 16, 2001 . . . , did not meet the technical requirements of Section 5103 . . . .

"The District's knowledge of [Emma]'s error, its intent to stand mute and refusal to cooperate with [Emma], and its hope that the District could take advantage of [Emma]'s mistaken bid by obtaining the forfeiture of [Emma]'s $815,000.00 bid bond, was reflected in an e-mail . . . written by Tom Jeffries of CMTS to the District's Jerry Norman and delivered shortly after the District received the bid withdrawal letter from [Emma] . . . on Friday afternoon.

"In the morning of Monday, November 19, 2001, and at the request of [Emma]'s president, Emanuel Yashari, [Emma]'s office manager, Mary Ann Austria, telephoned Mr. Jeffries whom the bid documents identified as the representative of the District who would take all inquiries about the bid process for the Parent project. Ms. Austria's telephone call was answered by Mr. Clements, Mr. Jeffries' supervisor, who identified himself and related to Ms. Austria that he would handle the call in Tom Jeffries' absence. Ms. Austria asked Mr. Clements if the District had received [Emma]'s bid withdrawal letter and offered to supply any further information that the District might require concerning [Emma]'s mistake and withdrawal of its bid. Mr. Clements replied that the District had received [Emma]'s letter, but that the District had instructed CMTS not to discuss the matter with anyone. Instead, Mr. Clements stated that the letter had been sent to the District's legal counsel and if the District should require additional information from [Emma], the District's legal counsel would contact [Emma].

"Ms. Austria immediately related the contents of the telephone conversation to Mr. Yashari. Responding to the statements exchanged in this telephone conversation, Mr. Yashari was reasonable in his actions in believing that if the District required additional information from [Emma] about [Emma]'s mistake and withdrawal of its bid, the District's legal counsel would contact [Emma]. Further, Mr. Yashari was reasonable in his actions by not taking any further steps to notify the District, within the 5-day statutory period, of additional details about [Emma]'s mistaken bid. The District's legal counsel never contacted [Emma] about its mistake or withdrawal of its bid.

"When [Emma] learned of the District's position that [Emma] had failed to provide adequate detail about the mistake in [Emma]'s bid withdrawal letter

of November 16, 2001, [Emma] promptly directed an attorney to send another letter to the District, therein detailing all aspects and details about how the mistake occurred in [Emma]'s bid for the Parent project . . . .

"As a result of the fact that [Emma] sent its bid withdrawal letter to the District on November 16, 2001, in conjunction with the fact that the District's representative, Mr. Clements, told [Emma]'s representative, Ms. Austria, that the District's legal counsel would contact [Emma] if the District required additional information from [Emma], the District is now precluded from claiming that [Emma] failed to substantially comply with . . . Section 5101 et seq.

"The Court responds to the specific requests for its Statement of Controverted Issues as follows:

"4[.] [Emma]'s bid withdrawal letter, submitted to the District on November 16, 2001, informed the District that [Emma] had made a clerical error in totaling [Emma]'s overall cost estimate for the Parent project. However, because [Emma]'s bid withdrawal letter failed to include sufficient detail as to how the mistake occurred, [Emma]'s bid withdrawal letter, in and of itself, failed to supply the detail required by . . . Section 5103. Further, in the follow-up telephone conversation between Ms. Austria and Mr. Clements on November 19, 2001, Ms. Austria did not provide any detail as to how [Emma]'s mistake occurred in its bid submitted for the Parent project. Therefore, [Emma] has failed to substantially comply with . . . Section 5103;

"5. The District's receipt of [Emma]'s bid withdrawal letter of November 16, 2001, alone did not trigger a duty upon the District to inform [Emma] of the requirements of . . . Section 5103;

"6. [Emma] was legally entitled to withdraw its November 14, 2001, bid because [Emma] had made a material clerical error in the bid process;

"7. The District is equitably estopped to claim that [Emma] failed to comply with . . . Section 5101, et seq.;

"8. [Emma] did prove all the elements required to invoke equitable estoppel against the District;

"9. For equitable estoppel to apply, the relevant knowledge is not [Emma]'s knowledge of the application of . . . Section 5103, but rather [Emma]'s knowledge of the requirements of the Code. [Emma] proved it was ignorant of the requirements of the Code beyond those that it complied with in [Emma]'s bid withdrawal letter of November 16, 2001;

"10. [Emma] proved that the District intended by its actions to induce [Emma] into not complying with . . . Section 5103;

"11. [Emma] proved that it reasonably relied on the District's actions in not complying with all the provisions of . . . Section 5103;

"19. [Emma] is relieved of its mistaken bid submitted for the Parent project. Accordingly, the District's cross-complaint for breach of contract and declaratory relief is moot and, therefore, dismissed with prejudice."

Although not discussed in the trial court's statement of decision, it was undisputed that (1) in advertising for the second set of bids, the District sent, and Emma received, written notice that any attempted withdrawal of a submitted bid had to comply with sections 5101–5103; (2) Emma did not send its November 16 bid withdrawal letter until it learned it was the low bidder on a second District project; and (3) Emma earlier successfully withdrew a mistaken bid on a project with another school district only after the other district advised Emma how to modify its original insufficient withdrawal letter.

## DISCUSSION

The District contends the trial court erred as a matter of law in finding the District was estopped from enforcing the original bid because of its response to Emma's telephone call. We disagree.

Section 100 states: "The Legislature finds and declares that placing all public contract law in one code will make that law clearer and easier to find. Further, it is the intent of the Legislature in enacting this code to achieve the following objectives:

"(a) To clarify the law with respect to competitive bidding requirements.

"(b) To ensure full compliance with competitive bidding statutes as a means of protecting the public from misuse of public funds.

"(c) To provide all qualified bidders with a fair opportunity to enter the bidding process, thereby stimulating competition in a manner conducive to sound fiscal practices.

"(d) To eliminate favoritism, fraud, and corruption in the awarding of public contracts."

Section 5100 provides: "(a) 'Public entity' means the state, Regents of the University of California, a county, city and county, city, district, public authority, public agency, and any other political subdivision or public corporation in the state.

"(b) 'Bid' means any proposal submitted to a public entity in competitive bidding for the construction, alteration, repair, or improvement of any structure, building, road or other improvement of any kind."

Section 5101, subdivision (a), reads in part: "A bidder shall not be relieved of the bid unless by consent of the awarding authority nor shall any change be made in the bid because of mistake, but the bidder may bring an action against the public entity in a court of competent jurisdiction in the county in which the bids were opened for the recovery of the amount forfeited, without interest or costs. . . ."

Section 5103 states: "The bidder shall establish to the satisfaction of the court that:

"(a) A mistake was made.

"(b) He or she gave the public entity written notice within five days after the opening of the bids of the mistake, specifying in the notice in detail how the mistake occurred.

"(c) The mistake made the bid materially different than he or she intended it to be.

"(d) The mistake was made in filling out the bid and not due to error in judgment or to carelessness in inspecting the site of the work, or in reading the plans or specifications."

In *Kajima/Ray Wilson v. Los Angeles County Metropolitan Transportation Authority* (2000) 23 Cal.4th 305, 308 [96 Cal.Rptr.2d 747, 1 P.3d 63] (*Kajima*), a public agency refused to award a construction contract to the low bidder as required under the public contracting statutes. The Supreme Court held that the rejected bidder could recover its bid preparation costs, but not lost profits, under a promissory estoppel theory. *Kajima* held that the public contracting statutes, enacted primarily to protect the public, limited the applicability of estoppel or other equitable remedies available to even a wronged bidder:

"[I]t is clear 'that neither the doctrine of estoppel nor any other equitable principle may be invoked against a governmental body where it would operate to defeat the effective operation of a policy adopted to protect the public.' [Citation.] We have stated that the competitive bidding statutes are ' "enacted for the benefit of property holders and taxpayers, and not for the benefit or enrichment of bidders, and should be so

construed and administered as to accomplish such purpose fairly and reasonably with sole reference to the public interest." ' [Citation.] Of course, as a practical matter, in benefiting the public by requiring fairness in evaluating and accepting bids, and thereby increasing competition, the competitive bidding laws also benefit bidders. (See . . . § 100, subds. (b)–(d).) It is difficult, however, to ascertain how the general public benefits by allowing a disappointed bidder to recover lost profits; indeed, just the opposite seems true. Permitting recovery of lost profits 'unduly punishes the tax-paying public' while providing an unfair windfall to bidders . . . 'for effort they did not make and risks they did not take.' [Citation.] As one commentator has stated, '[t]he misfeasance of public officials in failing to award the contract to the lowest bidder should not be compounded by not only requiring unjustified additional expenditure of public funds on the awarded contract, but also allowing recovery for lost profits to the aggrieved low bidder.' [Citation.]" (*Kajima, supra,* 23 Cal.4th at pp. 316–317.)

More recently, the Supreme Court held the equitable principle of contract abandonment did not apply to public entity, competitively bid contracts because of the comprehensiveness and public policy behind the Public Contract Code. (*Amelco Electric v. City of Thousand Oaks* (2002) 27 Cal.4th 228, 232, 234–242 [115 Cal.Rptr.2d 900, 38 P.3d 1120].) "Under the abandonment doctrine, once the parties cease to follow the contract's change order process, and the final project has become materially different from the project contracted for, the entire contract—including its notice, documentation, changes, and cost provisions—is deemed inapplicable or abandoned, and the plaintiff may recover the reasonable value for all of its work. Were we to conclude such a theory applied in the public works context, the notion of competitive bidding would become meaningless." (*Id.* at p. 239.)

The District relies heavily on *A & A Electric, Inc. v. City of King* (1976) 54 Cal.App.3d 457 [126 Cal.Rptr. 585] *(A & A).* In *A & A,* a low bidder tried to withdraw or increase its mistakenly low bid without following the statutory bid withdrawal procedure. During the city council's debate whether to permit the bidder's withdrawal, the city attorney stated the city could accept the bid and later agree to increase it if the bidder could prove the mistake was clerical. The public entity, although actually aware that the bidder had made a mistake and wanted to withdraw unless the bid was increased to reflect the error, nonetheless awarded the bidder the contract at the bid price. The bidder refused to perform; the city sought forfeiture of the bid bond. The bidder sued to rescind the contract and be relieved from forfeiture of its bid bond; the city cross-complained, seeking both forfeiture of the bond and damages for the difference between the bidder's bid and the higher cost incurred after the city awarded the contract to the next highest bidder. The trial court gave judgment for the bidder, awarded the bidder the prayed-for relief and attorney fees, and denied the city damages on its cross-complaint. The appellate court reversed,

holding the bidder failed to substantially comply with the bid withdrawal statute, and entered judgment for the city, but only for the amount of the bid bond, holding the city could not recover both the bond amount and the difference between the lower and higher bids.

*A & A* noted that before the Legislature's 1971 enactment of the public contracting bid and withdrawal statutes, a bidder seeking withdrawal could sue for much of the equitable relief available at common law. However, the 1971 legislation enacted a comprehensive scheme governing public contracts. "The Legislature may establish a statutory procedure for the exercise of a common law right and in the absence of some constitutional infirmity a failure to comply with the procedure may be deemed a waiver of the right to relief. [Citation.] [¶] We are persuaded that [the bid withdrawal statutes] establish the exclusive procedure for relieving a bidder from a mistake in a bid submitted to a public entity . . . ." (*A & A Electric, Inc. v. City of King, supra,* 54 Cal.App.3d at pp. 463–464.)

However, of relevance here, *A & A* expressly noted that the city attorney's comment that the city could accept the mistaken low bid but later increase it if the bidder could show the reasonableness of the mistake might raise an estoppel issue. However, the bidder expressly waived any estoppel claim, and thus the court would not reach it. (*A & A Electric, Inc. v. City of King, supra,* 54 Cal.App.3d at pp. 465–466.) Thus, rather than exempting the City from an estoppel claim, *A & A* expressly recognized that estoppel might apply in the bid withdrawal context to prevent a public entity from enforcing a mistakenly low bid.

Moreover, in citing *A & A* with approval, *Balliet Bros. Constr. Corp. v. Regents of University of California* (1978) 80 Cal.App.3d 321, 327 [145 Cal.Rptr. 498], stated: "The indicated construction of [the bid withdrawal statutes] is also consistent with the principal objective of the . . . remedy, which is to relieve a mistaken bidder of liability *on his bid.* This objective appears from the remedy's nonstatutory predecessor, which was an equitable action for rescission of the bid on the ground of mutual mistake. [Citations.] It may reasonably be presumed that the Legislature intended to permit the same result when it enacted the [bid withdrawal statutes] in 1971. [Citations.]" Thus, while the primary purpose of the comprehensive Public Contract Code is to protect taxpayers and ensure fairness in the bidding process, the Legislature also intended for mistaken bidders to be relieved of liability on mistakenly low bids resulting from clerical error.

"Although equitable estoppel may apply to government actions where justice and right so require, 'estoppel will not be applied against the government if the result would be to nullify a strong rule of policy adopted

for the benefit of the public [citations] or to contravene directly any statutory or constitutional limitations. [Citation.]' [Citations.]" (*Transamerica Occidental Life Ins. Co. v. State Bd. of Equalization* (1991) 232 Cal.App.3d 1048, 1054–1055 [284 Cal.Rptr. 9] [state agency's counsel's opinion that the lower of two tax rates applied to certain transactions did not estop state from later arguing the higher rate applied].)

In *Medina v. Board of Retirement* (2003) 112 Cal.App.4th 864 [5 Cal.Rptr.3d 634], two deputy sheriffs received more generous "safety personnel" retirement benefits than benefits provided to "general" county employees. When the two deputies became deputy district attorneys, eligible only for the lower "general" benefits, the county mistakenly continued them in the "safety" retirement category. Many years later, the county discovered the error and reclassified them as "general" retirement members effective from the date they became deputy district attorneys. The deputies sued to be reinstated as "safety" members under an estoppel theory. The trial court ruled in favor of the county. The appellate court affirmed, holding estoppel could not apply because deputy district attorneys could not legally be "safety" members under controlling statutes and ordinances.

*K & K Services, Inc. v. City of Irwindale* (1996) 47 Cal.App.4th 818 [54 Cal.Rptr.2d 836] also refused to apply estoppel to let an unlicensed contractor enforce a contract against a city where statutes required that only licensed contractors could do that type of work. *K & K* also held an allegation that a city worker told *K & K* he "believe[d]" no license was required, was insufficient to overcome the presumption that unlicensed contractors know the law. (*Id.* at p. 827.)

In *State of California v. Haslett Co.* (1975) 45 Cal.App.3d 252, 256–258 [119 Cal.Rptr. 78], state agents orally agreed that if tenants of a state building spent money refurbishing the building, the tenants would be given long-term leases sufficient to cover their costs and a reasonable return. After the tenants spent the money, the state refused to honor the agreement, which violated the statute of frauds, because statutes required the state to make such agreements only in writing. *Haslett* affirmed the trial court's dismissal of the tenants' case against the state, holding that the state could not be estopped from denying the validity of the oral agreement.

In *Merco Constr. Engineers, Inc. v. Los Angeles Unified School Dist.* (1969) 274 Cal.App.2d 154, 159–165 [79 Cal.Rptr. 23], a bidder wanted to substitute one subcontractor's bid for another subcontractor's bid, but failed to follow the statutory procedures for doing so. The bidder contacted a district agent, who told the bidder to leave the bid as it was, have it accepted, and later apply to make the change. The agent then went on to promise the

bidder that the change application would be approved. The bidder relied on the agent's promise and took no further action to change or withdraw the bid. The district accepted the original bid and then refused to change it. *Merco* held the district was not estopped to enforce the accepted bid.

However, the case closest to our facts applied estoppel against a public agency albeit by another public agency. *Fullerton Union High School Dist. v. Riles* (1983) 139 Cal.App.3d 369, 378–384 [188 Cal.Rptr. 897], applied estoppel against the State Department of Education, forcing it to reimburse a school district which had applied for authorized vocational training funds. The Department originally encouraged the school district to apply for the funds, but then reversed itself and deducted the payments from later state payments to the school district. The appellate court applied estoppel and ordered the Department to repay the district. The case so held because (1) the school district legally was eligible for the funds, and (2) it was unfair for the State to withhold the money after inducing the school district to apply for it.

*Medina* set out the rules governing estoppel against public entities: "Equitable estoppel may be asserted against the government in some circumstances. . . . The requisite elements for equitable estoppel against a private party are: (1) the party to be estopped was apprised of the facts, (2) the party to be estopped intended by conduct to induce reliance by the other party, or acted so as to cause the other party reasonably to believe reliance was intended, (3) the party asserting estoppel was ignorant of the facts, and (4) the party asserting estoppel suffered injury in reliance on the conduct. . . . [T]he doctrine of equitable estoppel may be applied against the government where justice and right require it. . . . Correlative to this general rule, however, is the well-established proposition that an estoppel will not be applied against the government if to do so would effectively nullify a strong rule of policy, adopted for the benefit of the public . . .. The tension between these twin principles makes up the doctrinal context in which concrete cases are decided. . . . The government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel . . . ." (*Medina v. Board of Retirement, supra,* 112 Cal.App.4th at pp. 868–869, internal quotations and citations omitted.)

█ The general public contracting law is designed to protect taxpayers, not bidders. However, the bid withdrawal statutes are designed to permit bidders to withdraw mistaken low bids. Estoppel is available against public entities in narrow circumstances, but not if its application would contradict existing statutes or public policy.

Here, the District was statutorily empowered to permit Emma's bid withdrawal. In contrast, the cases discussed above precluded the use of estoppel where applying it would result in enforcing illegal agreements.

Moreover, here the District deliberately engineered an attempt to enforce a contract it knew was mistakenly low. The District did so to try and extract the bid bond amount to cover the project's true cost.

In all the other cases rejecting estoppel, there was no evidence that the public entities' assurances to the bidders were anything other than innocent mistakes. We decline to bar estoppel against a public entity where, as here, the public entity deliberately misled a mistaken bidder from timely complying with the bid withdrawal statutes. Taxpayers do not have an interest in lowering the costs of public projects by unfairly cheating mistaken bidders out of a portion of a project's true costs. Doing so would encourage bidders to try and recapture some additional revenue with false or exaggerated change orders. Moreover, encouraging such practices will discourage honest contractors from bidding for public projects, thus lowering competition and eventually driving up the cost of public works projects. Approving the public agency conduct found to have occurred here would encourage agencies unfairly to shift some of a project's true cost from the public to the mistaken bidder. Given the current state of squeezed public budgets, public agencies would feel compelled to repeat the District's strategy in this case. All these results are inconsistent with the Public Contract Code's purpose of ensuring fairness in the bidding, awarding, and administration of public contracts.

In addition, here the trial court found that Emma generally knew the public contracting law, including the requirement that it submit a written withdrawal letter less than five days after the District deemed it the low bidder. Emma did so. Although Emma did not substantially comply with the bid withdrawal statutes, the District deliberately induced Emma's failure. Emma earlier corrected an originally timely but inadequate written withdrawal only when the other district contacted it.

For all these reasons, the trial court properly found the District estopped from enforcing the contract.

## DISPOSITION

We affirm the judgment. Emma is entitled to its costs on appeal.

Spencer, P. J., and Vogel (Miriam A.), J., concurred.

A petition for a rehearing was denied January 22, 2004, and appellant's petition for review by the Supreme Court was denied April 21,2004. Werdeger, J., did not participate therein.