[No. H028931. Sixth Dist. Mar. 27, 2007.]

ROBERT FEDUNIAK et al., Plaintiffs and Respondents, v.
CALIFORNIA COASTAL COMMISSION, Defendant and Appellant.

## COUNSEL

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, J. Matthew Rodriquez, Assistant Attorney General, Joseph Barbieri and Christiana Tiedemann, Deputy Attorneys General, for Defendant and Appellant.

Noland Hamerly, Etienne & Hoss, Myron E. Etienne and Michael Masuda for Plaintiffs and Respondents.

James S. Burling and Lawrence G. Salzman for Pacific Legal Foundation as Amicus Curiae on behalf of Plaintiffs and Respondents.

## OPINION

## RUSHING, P. J.—

### INTRODUCTION

In this case, we conclude that the doctrine of equitable estoppel does not bar the California Coastal Commission from ordering a coastal homeowner to remove a private three-hole golf course from around the house and restore the area to its native sand dune vegetation in accordance with applicable restrictions on landscaping.

### STATEMENT OF THE CASE

In 2002, the California Coastal Commission (Commission) issued cease-and-desist and restoration orders, directing plaintiffs Robert and Maureen Feduniak (the Feduniaks) to remove the three-hole pitch-and-putt golf course that surrounded their house on the Monterey County coast and restore the grounds to the dune vegetation native to the area. The Feduniaks challenged the orders by filing a petition for a writ of administrative mandate.

(Code of Civ. Proc., § 1094.5.) They claimed that the Commission's orders were invalid; and even if valid, the Commission was estopped from enforcing them. The trial court agreed with the second claim and granted the writ, estopping the Commission from enforcing its orders for as long as the Feduniaks owned the property.

The Commission appeals from the judgment and claims the court erred in applying estoppel.

We agree and reverse the judgment.

BACKGROUND

In the early 1980's, Bert and Bonnie Bonanno, James and Gail Griggs, and John and Marcia Miller were co-owners of a 1.67-acre parcel on the 17 Mile Drive in the Asilomar Dunes area of Pebble Beach in Monterey County. In May of 1983, the owners applied to the Commission for a development permit to demolish the existing house and build a larger one. In July 1983, the Commission granted the permit with conditions.

The Commission determined that the parcel is located within the Asilomar Dune complex, much of which is considered an "environmentally sensitive habitat area" (ESHA) because of the unique, indigenous flora that had evolved over time and provided stability for the dune environment. A survey of the parcel at the time revealed that "the site has been severely altered through previous home construction"; its "vegetation is mainly iceplant and other exotics with a few randomly occurring native plants"; and "[t]he native plants on-site as well as in the general area, are for the most part threatened by the spread of the aggressive iceplant." Consequently, the "site requires restoration rather than preservation."

In accordance with the general policy for new development, which required native landscaping and botanic easements to protect the undeveloped dune areas, the Commission limited the size of the proposed new home to 14 percent of the parcel "to prevent adverse impacts to the habitat." It further required the owners to dedicate and record an open space "easement for the protection of the scenic and natural habitat values on the site" that would extend over the remaining 86 percent of the parcel and include provisions "to prohibit development; to prevent disturbance of native groundcover and wildlife; to provide for maintenance and restoration needs in accordance with

the approved landscape plan; and to specify conditions under which non-native species may be planted or removed, trespass prevented, and entry for scientific research secured."[1]

In addition, the Commission required the owners to submit for review and approval a landscape and maintenance plan prepared by a professional botanist. "The plan shall show the removal of all ice plant and other exotics on the site *and revegetation of the lot with dune vegetation native to the Asilomar dunes.*" (Italics added.) The permit further provided, "Unless waived by the Executive Director, a separate coastal permit shall be required for any additions to the permitted development."

The Commission found that "[i]mplementation of a native revegetation program will restore the site"; and, with the dedicated easement and restored landscape, "the proposed development can be found consistent both with previous Commission action in this area and with Section 30240(b) of the Coastal Act, as an adjacent environmentally sensitive habitat area will be protected."[2]

The owners of the property agreed to all of the conditions, at least on paper, and initially complied with them. They recorded an irrevocable offer to dedicate an open space easement, which incorporated by reference the specific provisions of the permit, in which they agreed "to restrict development on and use of the Property so as to preserve the open-space and scenic values present on the property and so as to prevent the adverse direct and cumulative effect on coastal resources and public access to the coast which could occur if the Property were not restricted . . . ."[3] The owners also submitted a landscape plan providing for the removal of nonnative plants and

---

[1] "An open-space easement is an instrument whereby the owner relinquishes to the public the right to construct improvements upon the land, effectively preserving for public use or enjoyment the natural or scenic character of the open-space land. (See Gov. Code, § 51051.)" (*Paoli v. California Coastal Com.* (1986) 178 Cal.App.3d 544, 548, fn. 2 [223 Cal.Rptr. 792].)

[2] The California Coastal Act of 1976 (Coastal Act) is codified in Public Resources Code, section 30000 et seq. It replaced the California Coastal Zone Conservation Act of 1972, which had been enacted by initiative measure in 1972. (See Historical and Statutory Notes, 56B West's Ann. Pub. Resources Code (1996 ed.) foll. § 30000, p. 131.)

Public Resources Code section 30240 provides, "(a) Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas. [¶] (b) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat and recreation areas."

All further statutory references are to the Public Resources Code unless otherwise specified.

[3] A title report dated October 14, 1983, reveals the existence of the irrevocable offer to dedicate an open space easement.

In 1986, the Del Monte Forest Foundation, Inc. (the Foundation), which was designated by

restoration of the entire site to native dune plants and grasses. On October 28, 1983, the Commission issued the permit.

After receiving the permit, the Bonannos, who by this time had become the sole owners of the property, modified the original landscape plan to include a three-hole pitch-and-putt golf course. They submitted the new plan to the Pebble Beach Company for its approval.[4] However, they did not submit it to the Commission or seek a supplemental permit for additional development, as required by their permit. The Pebble Beach Company approved the golf course. By 1985, the new house was built, the golf course was installed, and the property became known as Fan Shell Greens.

In 1996, the Bonannos' architect, Eric Miller, applied to the Monterey County Planning and Building Inspection Department (Planning Department) for a permit to build a caretaker's house on the property.[5] In the Bonannos' application, Miller represented that there were no easements on the property. The Planning Department approved the application, finding, among other things, that the property complied with "all rules and regulations pertaining to the use of the property, that no violations exist on the property and that all zoning abatement costs, if any[,] have been paid." No one appealed from the Planning Department's decision to issue the permit.[6]

Early in 2000, the Feduniaks learned that Fan Shell Greens was for sale. Mr. Feduniak testified below that he and his wife had seen the property with its prominent golf course numerous times in the 1980's and had always liked its unique landscaping. Consequently, they made an offer, and the Bonannos accepted it.

In their real estate transfer disclosure statement, the Bonannos answered "Yes" concerning whether there were "encroachments, easements or similar matters that may affect [the Feduniaks'] interest in the subject property."

the Commission to hold and maintain the open space in the Del Monte Forest area of Monterey County, formally accepted the owners' offer of an easement, and its acceptance was recorded.

[4] As part of the deeds and covenants, conditions, and restrictions to all properties in Pebble Beach, all construction and development required the approval of the Pebble Beach Company.

[5] By 1996, Monterey County had adopted a local coastal plan, and the Commission had certified it, thereby making the Planning Department the permitting agency for development in coastal areas within the county. (See §§ 30519, 30600, 30600.5; *Kaczorowski v. Mendocino County Bd. of Supervisors* (2001) 88 Cal.App.4th 564, 569 [106 Cal.Rptr.2d 14].) Thereafter, the Commission's role in the permit process for coastal development was to hear appeals from decisions by the county to grant or deny permits. (§ 30603.)

[6] Where the local government grants a coastal development permit, the action may be appealed to the Commission by the applicant, any aggrieved person, or two members of the Commission. (§ 30625, subd. (a).)

However, they disclosed only a "fence encroachment" and did not also disclose the easement and permit restrictions.

The Feduniaks obtained a preliminary title report from Old Republic Title Company, but neither it nor the final report revealed the restrictions, although they were recorded. The Feduniaks did not consult with the Commission or check its files concerning the property or otherwise rely on any representations or information from the Commission in deciding to purchase the property. Based on the Bonannos' disclosure statement and the title report, they bought the property for $13 million. Mr. Feduniak testified below that they would not have bought the property if the golf course had not been there.

In August 2001, Steven Staub, a forester for the Foundation, wrote to the Feduniaks to arrange an inspection review of the property to ensure its compliance with the terms of the open space easement, which he attached to his letter. The Feduniaks were bewildered because they had no knowledge of the easement. Moreover, Mr. Feduniak testified that it seemed to them "inconceivable" that there was a problem that had gone unnoticed for such a long time.

Staub and his colleagues inspected the property and met with the Feduniaks a few times. In July 2002, Staub wrote again and informed the Feduniaks that the current landscaping on the property did not comply with the open space easement. He acknowledged that the golf course was installed by the former owners and that the Feduniaks may not have known about the easement when they bought the property. Nevertheless, he attached a copy of the original landscape plan that the Bonannos had submitted to the Commission, which had been approved, and offered it as a reference and starting point for bringing the property into compliance. He also offered the assistance of experienced habitat consultants in helping them restore the easement area to native dune vegetation and create functional and aesthetically pleasing native landscaping.

In September 2002, the Commission staff learned from Staub about the compliance problem on the property. Staff reviewed the permit and visited the parcel. In December, the Commission notified the Feduniaks that the golf course violated the easement. Consequently, the Commission requested that the Feduniaks submit a removal and restoration plan.

The Feduniaks declined, and in February 2003, the Commission gave notice of its intent to issue cease-and-desist and restoration orders, and thereafter a formal proceeding was commenced. In July 2003, after an administrative hearing, the Commission approved the issuance of

cease-and-desist and restoration orders. It found that the golf course constituted an "unpermitted development" that was inconsistent with the permit condition, which required that the entire area around the proposed house "be restored with native dune vegetation and preserved with a dedicated easement for the protection of scenic and natural habitat values." Thereafter, the Feduniaks sought the instant writ of administrative mandate.

At the hearing on the petition, David Armanasco, a longtime resident of Pebble Beach and former member of the Commission, testified that he had seen the golf course for many years. He was unaware of the permit requirements, open space easement, the contents of the administrative file. Therefore, he had no idea the course violated them. He also was not aware of any statements or representations by the Commission to the Feduniaks that the golf course complied with those conditions.

Armanasco further said that although he and other commissioners took field trips with staff along the coast, the purpose of the trips was not to investigate new permit violations or generally monitor compliance with previous permits but to gather information about matters that were pending or had been resolved.

Cheryl Burrell and Jeff Marko, who worked for the Pebble Beach Company, each testified that on different occasions they met with some commissioners at various places along the 17 Mile Drive from where the three-hole golf course was plainly visible. However, both testified that none of the visits concerned the golf course, and there was no discussion of its compliance with applicable restrictions.

Nancy Cave, the Northern California supervisor of enforcement for the Commission, testified about how permit conditions were enforced. She explained that the enforcement program had long suffered from an enormous backlog of cases caused by inadequate funding and staff. Moreover, the Commission issued approximately 1,000 permits every year, making it humanly impossible to continually visit each parcel to monitor compliance with permit conditions. Consequently, the Commission focused resources where problems were likely to arise: parcels (1) for which the permit conditions were initially challenged or resisted; and (2) about which they receive complaints of possible violations.

Cave opined that the Bonannos' original permit would not have been audited for compliance because they had accepted the proposed conditions without challenge or resistance. As a result, the permit application along with the proposed conditions appeared on the Commission's consent calendar, and it was approved without dispute or debate. Cave further noted that after the

permit was approved, the Bonannos appeared to comply with the conditions. They recorded their offer to dedicate an open space easement, submitted proof of recordation, and filed an appropriate landscape plan, which was approved. Accordingly, the file on its face showed compliance, and nothing would have triggered the attention of enforcement staff.

However, when the enforcement staff first learned of a possible permit violation from Staub of the Foundation, the Commission immediately commenced an investigation, visited the site, notified the Feduniaks in writing about the problem, advised them how to resolve the violation, and notified them that the failure to resolve the violation could result in an enforcement action.

Cave was unaware whether members of the Commission had ever seen the golf course. However, she opined that when a Commission member visits a site for a particular purpose, staff may or may not check with the enforcement unit concerning other pieces of property. She explained, "If we [know] they [are] going out in the field, we [might] ask them to look at a site that was already an identified enforcement case and take pictures. But typically they are focused on the reason that they're going out on the site visit and nothing else." Moreover, it is not routine for a Commission planner to review all permits in the area before making a visit to a particular site.

Cave further opined that one cannot determine whether there are permit violations by simply looking at a piece of property. Rather, one must review the record and the permit history. In this instance, simply seeing the golf course would not have led her to assume there was a permit violation because the house might have been built before the Commission was created.

In March 2003, the Feduniaks asked the Foundation about the possibility of making a payment in lieu of removing the golf course as a form of alternative mitigation that could be used to correct the environmental degradation elsewhere on the coast. The Foundation made some proposals and cost estimates and then submitted the idea of such a settlement to the Commission for its evaluation and approval.[7] However, the Commission declined the proposal for offsite mitigation.

---

[7] Concerning the estimates, the Foundation estimated the cost of removing the golf course and installing native plantings to be between $50,000 and $100,000. The Foundation estimated the cost of proposed offsite mitigation in the Pescadero Canyon area to be between $125,000 and $300,000. Mitigation in the Indian Village/Lemos House Foundation/Gingerbread House areas would cost between $100,000 and $250,000. Thus, the Foundation observed, "Any of these alternatives is thus likely to cost as much or more than replacing the existing golf course landscaping with native vegetation around the Feduniak residence."

*The Trial Court's Decision*

In its statement of decision, the trial court first rejected the Feduniaks' challenge to the Commission's orders, which was based on a claim that the underlying 1983 easement and permit restrictions were invalid because the property had been improperly designated as an ESHA or adjacent ESHA. The court found that the Commission's orders were supported by substantial evidence and that the Bonannos' failure to challenge the restrictions when they were imposed in effect barred the Feduniaks from doing so now.

Nevertheless, the court concluded that under the unique facts of this case, the Commission should be estopped from enforcing its orders against the Feduniaks. The court found that the Commission should have known that the golf course violated the easement and permit restrictions because (1) the golf course was easily visible, (2) it had been there for 18 years, and (3) the Commission did not inspect the site for compliance until 2002.

The court further found that the Feduniaks had no actual knowledge of the recorded easement or permit restrictions when they bought the property, and the Commission's "acquiescence as to the existence of the landscaping for such a long period of time contributed to [the Feduniaks'] lack of knowledge of the recorded easement and permit conditions," and, therefore, the Feduniaks "had no reason to believe their property was not in compliance with the law." Moreover, the Feduniaks relied on the Commission's inaction to buy the property.

The court declined to impute knowledge of the easement and permit restrictions to the Feduniaks. It found that it was reasonable for the Feduniaks to rely on the Bonannos' disclosure statement and the title report and conduct no further investigation. The court further opined that even if the Feduniaks had had knowledge of the easement and restrictions, "there is no reason they would have known that the landscaping purportedly violated the easement—in that the landscaping is primarily lawn, which is surrounded by native vegetation, and it has been in place for a very long time."

Last, the court concluded that the injury to the Feduniaks without estoppel exceeded any injury to the public with it. As support, the court noted that the Feduniaks "purchased the property because of the golf course"; it was in a degraded condition when they bought it; the golf course had existed for 18 years without objection; it did not cause any "ongoing resource damage"; and removing it would cost over $100,000. The court also opined that the Feduniaks had "persuasively argued that the property has never been in an Environmentally Sensitive Habitat Area [ESHA], nor adjacent to one."

The court rejected the Feduniaks' argument that estoppel should be permanent because they would lose future value if the orders were enforceable. The

court found the argument subjective and speculative. "The next buyer may not care about the present landscaping, and [the Feduniaks] may still have remedies against the title company and/or sellers for monetary damages." Rather, the court estopped the Commission from enforcing its orders for as long as the Feduniaks owned the property.

GENERAL PRINCIPLES

"The venerable doctrine of equitable estoppel or estoppel in pais, which rests firmly upon a foundation of conscience and fair dealing, [fn. omitted] finds its classical statement in the words of Lord Denman: '[T]he rule of law is clear, that, where one by his words or conduct wilfully causes another to believe the existence of a certain state of things, and induces him to act on that belief, so as to alter his own previous position, the former is [precluded] from averring against the latter a different state of things as existing at the same time . . . .' [Citation.]" (*City of Long Beach v. Mansell* (1970) 3 Cal.3d 462, 488 [91 Cal.Rptr. 23, 476 P.2d 423] (*Mansell*); see Evid. Code, § 623.[8])

"Generally speaking, four elements must be present in order to apply the doctrine of equitable estoppel: (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be [*sic*] acted upon, or must so act that the party asserting the estoppel had a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." (*Driscoll v. City of Los Angeles* (1967) 67 Cal.2d 297, 305 [61 Cal.Rptr. 661, 431 P.2d 245]; see *Honeywell v. Workers' Comp. Appeals Bd.* (2005) 35 Cal.4th 24, 37 [24 Cal.Rptr.3d 179, 105 P.3d 544].)

The government is not immune from the doctrine, and it may be applied " 'where justice and right require it.' " (*Mansell, supra*, 3 Cal.3d at p. 493.) However, it must not be applied if doing so "would effectively nullify 'a strong rule of policy, adopted for the benefit of the public . . . .' [Citation.]" (*Ibid.,* quoting *County of San Diego v. Cal. Water etc. Co.* (1947) 30 Cal.2d 817, 829–830 [186 P.2d 124].) Accordingly, "[t]he government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present *and,* in the considered view of a court of equity, the injustice [that] would result from a failure to uphold an estoppel is of sufficient dimension to justify any

---

[8] Evidence Code section 623, which codifies the doctrine, provides, "Whenever a party has, by his own statement or conduct, intentionally and deliberately led another to believe a particular thing true and to act upon such belief, he is not, in any litigation arising out of such statement or conduct, permitted to contradict it." (See *Lantzy v. Centex Homes* (2003) 31 Cal.4th 363, 384 [2 Cal.Rptr.3d 655, 73 P.3d 517] [recognizing codification].)

effect upon public interest or policy [that] would result from the raising of an estoppel." (*Mansell, supra*, 3 Cal.3d at pp. 496–497, italics added.)

The existence of an estoppel is generally a factual question. (*Albers v. County of Los Angeles* (1965) 62 Cal.2d 250, 266 [42 Cal.Rptr. 89, 398 P.2d 129].) Therefore, we review the trial court's ruling in the light most favorable to the judgment and determine whether it is supported by substantial evidence. (*J. H. McKnight Ranch, Inc. v. Franchise Tax Bd.* (2003) 110 Cal.App.4th 978, 991 [2 Cal.Rptr.3d 339]; *Brookview Condominium Owners' Assn. v. Heltzer Enterprises-Brookview* (1990) 218 Cal.App.3d 502, 511 [267 Cal.Rptr. 76].) " 'Substantial evidence' is evidence of ponderable legal significance, evidence that is reasonable, credible and of solid value. [Citation.] . . . [Citations.] . . . [Citation.] Inferences may constitute substantial evidence, but they must be the product of logic and reason. Speculation or conjecture alone is not substantial evidence. [Citations.]" (*Roddenberry v. Roddenberry* (1996) 44 Cal.App.4th 634, 651 [51 Cal.Rptr.2d 907].)

■ Although estoppel is generally a question of fact, where the facts are undisputed and only one reasonable conclusion can be drawn from them, whether estoppel applies is a question of law. (*Albers v. County of Los Angeles, supra*, 62 Cal.2d at p. 266; *Platt Pacific, Inc. v. Andelson* (1993) 6 Cal.4th 307, 319 [24 Cal.Rptr.2d 597, 862 P.2d 158].) Moreover, where estoppel is sought against the government, "the weighing of policy concerns" is, in part, a question of law. (*Lentz v. McMahon* (1989) 49 Cal.3d 393, 403 [261 Cal.Rptr. 310, 777 P.2d 83].) As the court in *Smith v. County of Santa Barbara* (1992) 7 Cal.App.4th 770 [9 Cal.Rptr.2d 120], explained, "the question whether estoppel should apply is not solely a question of fact. Whether the injustice [that] would result from a failure to uphold an estoppel is of sufficient dimension to justify the effect of the estoppel on the public interest must be decided by considering the matter from the point of view of a court of equity." (*Id.* at p. 776.)

Finally, it is settled that where even one of the requisite elements for estoppel is missing, it does not apply. (*In re Marriage of Brinkman* (2003) 111 Cal.App.4th 1281, 1289 [4 Cal.Rptr.3d 722]; *Green v. Travelers Indemnity Co.* (1986) 185 Cal.App.3d 544, 556 [230 Cal.Rptr. 13].) Here, more than one element is missing.

### DISCUSSION

The Commission contends that the record does not support any of the elements required for estoppel. As to three elements, we agree.

*The Commission's Knowledge*

Estoppel required the court to find that the Commission knew that the golf course violated the easement and permit restrictions. (*Driscoll v. City of Los Angeles, supra,* 67 Cal.2d at p. 305.)

It is undisputed that the Commission did not actually know about the easement and permit violations until 2002, when Steven Staub of the Foundation informed Commission staff about a possible compliance problem.

█ . However, actual knowledge is not invariably necessary for estoppel. Under certain circumstances, knowledge may also be imputed. (*Mansell, supra,* 3 Cal.3d at p. 491.) " '[The requirement of actual knowledge of the true facts on the part of the party to be estopped] applies in its full force only in cases where the conduct creating the estoppel consists of silence or acquiescence. It does not apply where the party, although ignorant or mistaken as to the real facts, *was in such a position that he ought to have known them, so that knowledge will be imputed to him.* In such a case, ignorance or mistake will not prevent an estoppel. Nor does the rule apply to a party who has not simply acquiesced, but who has actively interfered by acts or words, and whose affirmative conduct has thus misled another. Finally, the rule does not apply, even in cases of mere acquiescence, when the ignorance of the real facts was occasioned by culpable negligence.' [Citation.]" (*Id.* at p. 491, fn. 28, quoting 3 Pomeroy, Equity Jurisprudence (5th ed. 1941) § 809, pp. 217–219, fns. omitted, some italics added.)

Thus, knowledge of the pertinent facts may be imputed where the circumstances show that one ought to have known them, and this is especially so when the party to be estopped was negligent or made affirmative representations related to those facts. (*Mansell, supra,* 3 Cal.3d at p. 491.)

Here, the Commission made no affirmative representations to the Feduniaks. Indeed, it had no contact with the Feduniaks whatsoever.

Nevertheless the trial court imputed knowledge of the violation. The court reasoned that because the golf course was so visible, the Commission should have checked to make sure that it complied with easement and permit restrictions.

The record amply supports a finding that the golf course is prominently located and visible from the 17 Mile Drive. That fact and the uncontradicted testimony of David Armanasco, Cheryl Burrell and Jeff Marko to the effect that at various times Commission members and staff were at locations where

the golf course could be seen further support an inference that Commission members and/or staff should have been aware of its existence.

However, such imputed knowledge and the Commission's failure to check the property for compliance do not reasonably support the trial court's decision to charge the Commission with knowledge of the violation.

■ It is settled that when the party to be estopped does not say or do anything, its silence and inaction may support estoppel only if it had a duty to speak or act under the particular circumstances. (*Spray, Gould & Bowers v. Associated Internat. Ins. Co.* (1999) 71 Cal.App.4th 1260, 1268–1269 [84 Cal.Rptr.2d 552]; *Skulnick v. Roberts Express, Inc.* (1992) 2 Cal.App.4th 884, 891 [3 Cal.Rptr.2d 597]; see *Bowman v. McPheeters* (1947) 77 Cal.App.2d 795, 798 [176 P.2d 745].) In *Elliano v. Assurance Co. of America* (1970) 3 Cal.App.3d 446 [83 Cal.Rptr. 509], the court explained, " ' "An estoppel may arise also from silence as well as from words or conduct. But this is only where there is a duty to speak, and where the party upon whom such duty rests has an opportunity to speak, and, knowing that the circumstances require him to speak, remains silent." [Citations.] [¶] "It is not necessary that the duty to speak should arise out of any agreement, or rest upon any legal obligation in the ordinary sense. Courts of equity apply in such cases the principles of natural justice, and whenever these require disclosure they raise the duty and bind the conscience and base upon the omission an equitable forfeiture to the extent necessary to the protection of the innocent party." [Citation.]' " (*Id.* at p. 451.)

For example, in *Spray, Gould & Bowers v. Associated Internat. Ins. Co.*, *supra*, 71 Cal.App.4th 1260, an insurance company was estopped from arguing that a claim was timebarred because the company had a duty under the Fair Claims Practice Settlement Regulations to advise the claimant of the applicable time limits and had not done so. (*Spray, Gould & Bowers v. Associated Internat. Ins. Co., supra*, at pp. 1268–1269; accord, *Neufeld v. Balboa Ins. Co.* (2000) 84 Cal.App.4th 759, 761 [101 Cal.Rptr.2d 151].)

Similarly, in *Skulnick v. Roberts Express, Inc., supra*, 2 Cal.App.4th 884, the defendant Mackey represented to the plaintiffs Roberts and Mediquik that he would agree to a settlement only if it resolved all claims. Roberts and Mediquik did not object or otherwise respond to that precondition and later remained silent when the settlement was put on the record. Both the trial and appellate courts concluded that Roberts and Mediquik were estopped from seeking indemnification from Mackey. The appellate court explained that if they had intended to preserve their indemnification rights, they had a duty to affirm those rights when Mackey stated his precondition during settlement negotiations. Under the circumstances, their silence induced Mackey to continue discussions and enter a settlement. (*Id.* at p. 888.)

Here, the trial court implicitly found that the Commission had a duty to check the property for compliance and discover the violation because it had a right to do so. On appeal, the Feduniaks specifically argue that the Commission "had a duty and power to inspect and enforce conditions imposed by it on permits . . . ."

■ Certainly, the Commission has a general mandate to implement the Coastal Act to preserve and protect the California coast and thus has broad administrative responsibility to regulate coastal development by enforcing applicable laws and regulations and imposing conditions on development permits, including open space easements. (See *Marine Forests Society v. California Coastal Com.* (2005) 36 Cal.4th 1, 20, 25–26 [30 Cal.Rptr.3d 30, 113 P.3d 1062]; *McAllister v. County of Monterey* (2007) 147 Cal.App.4th 253 [54 Cal.Rptr.3d 116]; *Georgia-Pacific Corp. v. California Coastal Com.* (1982) 132 Cal.App.3d 678, 699 [183 Cal.Rptr. 395]; 12 Witkin, Summary of Cal. Law (10th ed. 2005) Real Property, §§ 862–867, pp. 1032–1041.)

However, we have found no authority suggesting that the Commission has a statutory duty to inspect all properties for compliance with conditions after a permit has been issued, let alone a duty to do so on an ongoing basis for as long as the permit is applicable. Likewise, we have found no authority indicating that the Commission owes a duty of care to future property buyers to regularly monitor property for easement violations so as to prevent them from buying property that is in violation of applicable restrictions. Neither the trial court nor the Feduniaks provide any such authority.

·Concerning the enforcement of easements and permit conditions, we note that Nancy Cave, an enforcement supervisor for the Commission, testified that the Commission issues approximately 1,000 permits per year, and the relatively small size of the enforcement staff and budgetary constraints make it impossible to monitor compliance on every property subject to permit conditions. Rather, as a practical matter, investigative and enforcement resources are focused where problems are most likely to arise or exist: properties where the conditions were challenged or resisted and properties about which they receive complaints.

Cave testified that the Bonannos' property did not fall within these categories and would not have triggered investigative action because the Bonannos had agreed to all of the permit conditions and appeared to have complied with them.

Cave further explained that when Commission staff visit a particular site, they do not ordinarily expand the scope of their purpose to include a review of the permits and conditions related to adjoining areas and a check for

compliance unless those properties are the subject of a pending action. Moreover, she opined generally that one cannot determine that a property is in violation of a permit condition by simply looking at it. One must view the property in light of the record and the permit history. In this instance, simply seeing the golf course on the property would not have led her to assume that there was a permit violation because the house might have been built before the Commission was created.[9]

In finding that the Commission should have discovered the violation, the trial court implicitly expected Commission members and staff to be fully aware at all times of the permit history of every piece of property within the Commission's jurisdiction and thus able to tell at a glance whether a particular property is in compliance with permit conditions. However, given Cave's testimony, we consider such an expectation to be unrealistic. Indeed, we believe common sense renders such an expectation unrealistic. Rather, given the practical considerations involved in inspecting property and enforcing easement and permit conditions and given the budgetary limitations on, and inherently discretionary nature of, allocating administrative resources for those purposes, as outlined by Cave, we find it unreasonable for the trial court to conclude that the mere sight of the golf course should have put the Commission on notice of a violation or at least triggered a duty to investigate.

In this regard, we find support in *Strong v. County of Santa Cruz* (1975) 15 Cal.3d 720 [125 Cal.Rptr. 896, 543 P.2d 264]. There, Strong had a building permit for a trailer park with 177 spaces. The permit provided that if it was not exercised before April 12, 1972, it would expire, and the park would be subject to a new density requirement that would limit it to 142 spaces. On April 7, the county issued a grading permit. In June, it approved construction plans and sewer hookups. Later, Strong sought to amend the permit to

---

[9] The Feduniaks argue that the court implicitly rejected Cave's testimony and therefore we must disregard it. We disagree.

Cave's position qualified her to testify about the history of enforcement, the personnel and budget available for enforcement, and the Commission's enforcement. Moreover, her qualifications were not challenged. The Feduniaks presented no evidence or testimony that contradicted her experience, opinions, and testimony or impeached her credibility. Nor did the Feduniaks offer a witness with similar qualifications to testify on those subjects.

We further observe that Cave's testimony was not internally inconsistent or inherently implausible, her explanation concerning why there would have been no investigation of the parcel before 2002 was reasonable, and no evidence was presented suggesting an alternative or different explanation.

Under the circumstances, we can conceive of no rational basis for the court to reject Cave's testimony and do not feel compelled to disregard it. (See *Beck Development Co. v. Southern Pacific Transportation Co.* (1996) 44 Cal.App.4th 1160, 1204 [52 Cal.Rptr.2d 518] [court may not arbitrarily reject uncontradicted evidence or do so without a rational basis]; *In re Jessica C.* (2001) 93 Cal.App.4th 1027, 1043 [113 Cal.Rptr.2d 597] [same]; see *Blank v. Coffin* (1942) 20 Cal.2d 457, 461 [126 P.2d 868]; *Hicks v. Reis* (1943) 21 Cal.2d 654, 660 [134 P.2d 788].)

exclude a required access road, and the county asserted for the first time that the permit had expired, and the park was now subject to the density limitation. (*Id.* at p. 723.)

Strong successfully sought a writ of mandate compelling the county to allow him to proceed with his original plans. Among other things, the trial court implicitly charged the county with knowledge of the permit's expiration date and found that its actions after the expiration date were predicated on the validity of the permit. Accordingly, the county waived any right to insist on a formal permit extension and was estopped from denying the validity of the original permit. (*Strong v. County of Santa Cruz, supra*, 15 Cal.3d at p. 724.)

The Supreme Court reversed. Concerning the imputation of knowledge, the court explained that "even if the county is charged by reason of its issuance of the permit with knowledge of the expiration date, we cannot ignore the evidence indicating that it did not in fact have such knowledge. There is no evidence that any county official in authority was aware of the expiration date prior to the approvals in question, and it is undisputed that approval would not have been issued if there had been such knowledge. In fact, throughout the hearings held before the board of supervisors in the fall and winter of 1973, the county counsel, the planning director, and other county employees repeatedly assured the board that Strong had a valid permit for 177 spaces, and Strong made similar representations to the board. [¶] To apply estoppel in favor of Strong under these circumstances would distort the salutary purposes underlying the doctrine." (*Strong v. County of Santa Cruz, supra*, 15 Cal.3d at p. 727.)

Here, the Commission did not know about the violation before 2002. It had no statutory duty to inspect the Bonannos' property for compliance after the golf course was installed and before the Feduniaks bought the property. And even if Commission members or staff saw the golf course at some point during that time, the circumstances do not support a finding that the Commission was negligent in failing to investigate the property sooner than it did.

The Feduniaks argue that the 1996 permit issued by the county for the Bonannos' caretaker house, in which the county found that that the property "is in compliance with all rules and regulations pertaining to the use of the property, [and] that no violations exist," should have put the Commission on notice of inquiry concerning the easement violation. However, the trial court did not rely on the 1996 permit to impute knowledge to the Commission. Moreover, we reject the argument for several reasons.

First, the county's finding does not specifically or necessarily include a determination concerning whether the property violates the easement and

permit restrictions because scope of the county's finding was expressly limited and based on only "verification of the Monterey County Planning and Building Inspection Department records indicat[ing] that no violations exist on the property." There is no evidence that those records included information about the easement or permit restrictions.

Even if the finding erroneously encompassed the open space easement, the county's finding of no violation cannot be attributed to the Commission because the county acted independently of the Commission and not as its agent for purposes of approving coastal development. As noted, upon certification of its local coastal program, the county replaced the Commission as the permitting agency for coastal development. (See fn. 5, *ante*.) The Commission's function thereafter was to review decisions by the county that were appealed. Thus, the county's finding cannot be deemed a representation, albeit erroneous, by the *Commission* to the Feduniaks that the golf course complied with all applicable easements or restrictions on the property. (Cf. *City and County of San Francisco v. Grant Co.* (1986) 181 Cal.App.3d 1085, 1092 [227 Cal.Rptr. 154] [city's action based on its ignorance of handicap access laws not attributable to state].) Moreover, the record does not establish that the Feduniaks even saw the county's finding. Although their preliminary title report noted the existence of the Bonannos' 1996 permit for the caretaker house, the title report did not include the county's finding.

Furthermore, the Feduniaks cite no authority for the proposition that even without an appeal, the Commission nevertheless has an independent, sua sponte duty to review the propriety of all decisions by local permitting agencies, including the accuracy of underlying factual findings. We have found no such authority.

Here, there was no appeal. Consequently, the record does not support an argument that the 1996 permit should have put the Commission on notice that there was, or might be, a violation of restrictions on the property.

Last, even if there had been an appeal, it would have been limited to a review of the county's determination that the proposed new caretaker house (new development) conformed to the standards set forth in the county's certified local coastal program or the public access policies set forth in the Public Resources Code. (See § 30603, subd. (b)(1).) The Commission's primary focus would have been on the evidence supporting that finding and not on whether there was an unrelated condition on the property that violated an easement or previously issued permit condition. Indeed, we consider it conjecture to assert that the Commission would have discovered that the golf course violated the open space easement during an appeal concerning the 1996 permit.

In short, we conclude that the Commission's regulatory inaction for so many years in the face of a prominently located golf course does not, by itself, support the trial court's finding that the Commission had constructive knowledge of the violation.

*The Commission's Intent*

In addition to the Commission's knowledge of the violation, the trial court also had to find that either (1) the Commission intended for the Feduniaks to take some action based on its regulatory inaction; or (2) it was reasonable for the Feduniaks to believe that the Commission so intended. (*Driscoll v. City of Los Angeles, supra,* 67 Cal.2d at p. 305.)

There is no evidence that the Commission intended for anyone to take action based on the fact that it had not enforced the easement for numerous years, and the trial court did not so find. Thus, the question is whether the record supports a finding that it was reasonable for the Feduniaks to believe the Commission intended others to take action based on its regulatory inaction.

Concerning this element, the trial court found that (1) the Commission acquiesced in the existence of the golf course for many years; (2) its acquiescence contributed to the Feduniaks' lack of knowledge about the easement; and (3) because they lacked such knowledge, they had no reason to believe their property was not in compliance with the law. The record does not support these findings, and the findings themselves do not support a finding of intent.

First, there is no evidence that the Commission knowingly, but passively, assented to the golf course—i.e., acquiesced in the golf course—even though it violated easement and permit restrictions. Indeed, any notion of acquiescence is conclusively rebutted by the fact that the Commission acted on the violation immediately after getting notice of it.

■ Perhaps what the trial court meant to say was that because the Feduniaks had seen the golf course remain unchanged for so many years, they inferred and believed that the Commission had acquiesced in it. Although that inference is not illogical, without any information about the property, the Commission's regulatory procedures, and the actions it had previously taken, it is purely speculative to infer that the Commission's inaction signaled regulatory acceptance. The Commission's apparent inaction could just as well reflect, and according to Cave did reflect, bureaucratic, budgetary, or personnel limitations on enforcement of easements and permit restrictions. (See *Lee v. Board of Administration* (1982) 130 Cal.App.3d 122,

135 [181 Cal.Rptr. 754] ["estoppel will not be applied where it is based on surmise or questionable inference"].) Accordingly, even if the Feduniaks inferred acquiescence solely from the Commission's inaction, we find that it was unreasonable for them to rely and act on it. (See *Mills v. Forestex Co.* (2003) 108 Cal.App.4th 625, 655 [134 Cal.Rptr.2d 273] ["Reliance by the party asserting the estoppel on the conduct of the party to be estopped must have been reasonable under the circumstances"].)

In any event, even if the Feduniaks initially believed that local agencies had accepted the golf course, they did not act on that belief except to seek out appropriate information before buying the property; nor did the Commission's inaction "contribute" to their lack of knowledge about the open space easement. Rather, the Feduniaks obtained a disclosure statement from the Bonannos and a preliminary title report. Thus, they were unaware of the easement because the Bonannos failed to disclose it and the title company failed to find it, and the Feduniaks relied on those failures, rather than their perception of the Commission's inaction, in buying the property.

Last, the court's finding that the Feduniaks had no reason to suspect that the golf course violated some restrictions may be true. However, that finding is not enough to support estoppel. The court had to find that because the Commission had not enforced the restrictions for numerous years, it was reasonable for the Feduniaks to believe that it would never do so. Even if we infer such an implied finding, we nevertheless conclude that it would have been unreasonable for the Feduniaks to believe there would be no future enforcement action despite a violation of valid landscaping restrictions.

In *Carty v. City of Ojai* (1978) 77 Cal.App.3d 329, 342–343 [143 Cal.Rptr. 506], the property owner agreed to the annexation of his property on the condition that it would be zoned for commercial uses, including a shopping center. Later, however, the city rezoned the area to prohibit such a use. The court found that the owner could not reasonably have believed that the commercial zoning designation would remain indefinitely.

Similarly, in *Scott v. City of Del Mar* (1997) 58 Cal.App.4th 1296, 1304 [68 Cal.Rptr.2d 317], the city enacted an ordinance to protect public access to the coast. Thereafter, it ordered homeowners to remove wooden seawalls that had been in place for over 40 years. The homeowners sought to estop the city from enforcing an order, arguing that the city had abandoned the property along the seawall long before the ordinance was enacted and had ignored the seawalls and subsequent improvements to them for decades. However, the court found that the city's inaction did not establish abandonment and was not enough to estop it from enforcing the new ordinance. (Cf. *City of Imperial Beach v. Algert* (1962) 200 Cal.App.2d 48, 49–53 [19 Cal.Rptr. 144]

[city estopped for denying abandonment of parcel for use as a street because over many years, the city and county had taken affirmative and unequivocal steps that demonstrated abandonment].)

■    Moreover, we observe that if it were reasonable for the Feduniaks to think that the restrictions would never be enforced because they had not been enforced for many years, then more generally, one could argue against the enforcement of a law that had not been enforced for many years and seek estoppel on that ground. However, courts have never accepted such reasoning. On the contrary, the mere failure to enforce the law, without more, will not estop the government from subsequently enforcing it. (See *Fontana v. Atkinson* (1963) 212 Cal.App.2d 499, 509 [28 Cal.Rptr. 25] [mere failure to enforce zoning ordinance does not estop later enforcement]; *Western Surgical Supply Co. v. Affleck* (1952) 110 Cal.App.2d 388, 392–393 [242 P.2d 929] [same regarding failure to enforce penal laws]; *Caminetti v. State Mut. Life Ins. Co.* (1942) 52 Cal.App.2d 321, 326 [126 P.2d 165] [same regarding Ins. Code].)

As the court in *Caminetti v. State Mut. Life Ins. Co., supra,* 52 Cal.App.2d 321, explained, "To govern themselves, the people act through their instrumentality which we call the State of California. The State of California functions through persons who are for the time being its officers. The failure of any of these persons to enforce any law may never estop the people to enforce that law either then or at any future time. It would be as logical to argue that the people may not proceed to convict a defendant of burglary because the sheriff perhaps saw him and failed to stop him or arrest him for another burglary committed the night before. [Citations.]" (*Id.* at p. 326.)

In sum, the record does not support a finding that the Feduniaks reasonably could have believed that the Commission intended its regulatory inaction to be relied and acted upon. (*Driscoll v. City of Los Angeles, supra,* 67 Cal.2d at p. 305.)

The Feduniaks cite numerous cases in support of the trial court's ruling. However, as our summaries reveal, none of these cases suggest that the Commission's years of inaction justify estopping it from enforcing the easement and permit restrictions.

In *Common Wealth Ins. Systems, Inc. v. Kersten* (1974) 40 Cal.App.3d 1014 [115 Cal.Rptr. 653], the president and three principal shareholders of a bank signed a promissory note on a loan to their bank. (*Id.* at pp. 1018–1019.) One of the shareholders discovered that his signature had been forged. However, he knowingly accepted the financial benefits from the loan. While the bank was still solvent, he assured a person (Kersten), whose stock had been

pledged as collateral, that he was doing everything possible to pay the loan. He also delayed revealing the forgery and did not repudiate it until after he knew that his bank was insolvent and could not repay the loan. (*Id.* at pp. 1027–1028.) The court found that when the bank was still solvent, the shareholder had a duty to disclose the forgery to Kersten, and his failure to do so induced Kersten to take no action against any of the people who signed the note. Thus, the shareholder's conduct estopped him from denying the validity of his signature. (*Id.* at p. 1028.)

*Shuer v. County of San Diego* (2004) 117 Cal.App.4th 476 [11 Cal.Rptr.3d 776] involved an action by a county employee for wrongful termination. There, the county was estopped from asserting as a defense the employee's failure to file an administrative appeal because the availability of an administrative appeal was unclear, and the county's direct affirmative conduct had induced the employee's belief that she had no administrative remedy. (*Id.* at pp. 486–487.)

*Emma Corp. v. Inglewood Unified School Dist.* (2004) 114 Cal.App.4th 1018 [8 Cal.Rptr.3d 213] involved an action by a contractor against a school district for rescission of a contract after it refused to permit him to withdraw his bid. The district filed a cross-claim for breach of the contract. The district was estopped from enforcing the contract because the district had by its conduct and statements deliberately misled the contractor concerning the withdrawal of his bid and prevented him from complying with the withdrawal statutes. (*Id.* at pp. 1030–1031.)

*J. H. McKnight Ranch, Inc. v. Franchise Tax Bd., supra,* 110 Cal.App.4th 978 involved a corporation's action for a tax refund. There, the tax board was estopped from asserting the failure to exhaust administrative remedies as a defense because the board had expressly agreed to terminate the administrative proceedings prematurely so that the corporation could immediately proceed to court. (*Id.* at pp. 991–993.)

*Christopher P. v. Mojave Unified School Dist.* (1993) 19 Cal.App.4th 165 [23 Cal.Rptr.2d 353] involved a molested child's action for relief from the failure to file a timely tort claim against the school district. The school district was estopped from asserting the failure to file a timely claim as a defense because an agent of the school—the teacher who had committed the molestation—caused the child to delay reporting it beyond the limitations period. (*Id.* at pp. 171–173.)

*Mahoney v. Board of Trustees* (1985) 168 Cal.App.3d 789 [214 Cal.Rptr. 370] involved an action by a teacher for reinstatement after the school accepted an unsigned transcription of his telephonic resignation. The district

was estopped from pursuing the teacher's resignation because he had disclaimed his telephonic resignation based on the school's formal written resignation procedures. The court explained, "Where top level administrative personnel represent to employees that a certain procedure exists, we believe a government employer should be equitably estopped from denying the existence of the procedure in cases where employees reasonably rely on it." (*Id.* at p. 801, fn. omitted.)

*Lerner v. Los Angeles City Board of Education* (1963) 59 Cal.2d 382 [29 Cal.Rptr. 657, 380 P.2d 97] involved an action by a teacher for reinstatement after the revocation of his credential was overturned and his credential restored. The board of education was estopped from asserting the statute of limitations as a defense because the teacher could not have commenced a reinstatement action before his credential was restored; the board gave him faulty advice that induced him to delay filing his action; the board restored his credential after the limitations period had passed; and the board failed to raise the limitations issue during the restoration proceeding. (*Id.* at pp. 396–399.)

*Tyra v. Board of Police etc. Commrs.* (1948) 32 Cal.2d 666 [197 P.2d 710] involved an action by a disabled firefighter for retirement benefits from his pension plan. There, the pension plan was estopped from asserting the statute of limitations because it had erroneously advised him that he was not entitled to benefits and thereby induced him to delay applying for them. (*Id.* at pp. 670–671.)

The cases cited by the Feduniaks exemplify the rationale and purpose of equitable estoppel: To " 'prevent a person from asserting a right which has come into existence by contract, statute or other rule of law where, because of his conduct, silence or omission, it would be unconscionable to allow him to do so.' [Citation]." (*Skulnick v. Roberts Express, Inc., supra,* 2 Cal.App.4th at p. 891.) Each one involved direct, purposeful affirmative statements and/or conduct by parties that reasonably induced another party to act or refrain from acting in a certain way to its detriment.

Here, the Commission had no contact with the Feduniaks. It took no affirmative action toward them and made no statements to them that could have induced action. Indeed, the Feduniaks did not even consult with the Commission before buying the property. The only "conduct" here is the Commission's regulatory inaction, and it is not comparable to the affirmative conduct and representations in the cases discussed above. If anything, those cases suggest that something more than inaction was necessary to estop the Commission. (See *Moore v. State Bd. of Control* (2003) 112 Cal.App.4th 371, 385 [5 Cal.Rptr.3d 116] ["silence as the basis for estoppel usually requires a

showing of special circumstances, such as a confidential or fiduciary relationship or an undertaking to provide advice by one who claims to be informed and knowledgeable in the matter"].)

Even when there is something more than mere inaction, such as affirmative conduct and representations, which reasonably induces another to take action, estoppel is still not invariably applied. This brings us to the third, and perhaps most important, element missing for estoppel in this case.

*Estoppel Against a Public Agency*

Estoppel against the government requires an additional finding not required against a private party. Here, the court also had to find that (1) estopping the Commission would not nullify a strong rule of policy adopted for the public's benefit and (2) the injustice to the Feduniaks without estoppel outweighs, and therefore justifies, any effect upon public interest or policy that results from estopping enforcement of the Commission's orders. (*Mansell, supra,* 3 Cal.3d at pp. 496–497.)

The cases cited by the Feduniaks surely demonstrate that courts will not hesitate to estop the government from asserting *a procedural barrier,* such as the statute of limitations or a failure to exhaust remedies, as a defense to claims against it, where the government's affirmative conduct caused the claimant's failure to comply with the procedural requirement.

■ However, in land use cases, " 'each case [of governmental estoppel] must be examined carefully and rigidly to be sure that a precedent is not established through which, by favoritism or otherwise, the public interest may be mulcted or public policy defeated.' " (*Mansell, supra,* 3 Cal.3d at p. 495, fn. 30, quoting *City of Imperial Beach v. Algert, supra,* 200 Cal.App.2d at p. 52.) As the court in *Toigo v. Town of Ross* (1998) 70 Cal.App.4th 309 [82 Cal.Rptr.2d 649] explained, a party "faces daunting odds in establishing estoppel against a governmental entity in a land use case. Courts have severely limited the application of estoppel in this context by expressly balancing the injustice done to the private person with the public policy that would be supervened by invoking estoppel to grant development rights outside of the normal planning and review process. [Citation.] The overriding concern 'is that public policy may be adversely affected by the creation of precedent where estoppel can too easily replace the legally established substantive and procedural requirements for obtaining permits.' [Citation.] Accordingly, estoppel can be invoked in the land use context in only 'the most extraordinary case where the injustice is great and the precedent set by the estoppel is narrow.' [Citation.]" (*Id.* at p. 321, quoting *Smith v. County of Santa Barbara, supra,* 7 Cal.App.4th at p. 775.)

Concerning the application of estoppel in land use cases, we find guidance in *Pettitt v. City of Fresno* (1973) 34 Cal.App.3d 813, 110 Cal.Rptr. 262 (*Pettitt*) and *State of California v. Superior Court (Fogerty)* (1981) 29 Cal.3d 240 [172 Cal.Rptr. 713, 625 P.2d 256] (*Fogerty*).

In *Pettitt*, the plaintiffs bought a building in an area zoned single-family residential. The building had two parts and two addresses, and each part had a different permitted nonconforming use, one for multiple residential, and the other for retail commercial. The plaintiffs applied for and received a building permit from the city that showed both addresses and erroneously authorized alterations to make the *entire* space commercial. The plaintiffs made some of the alterations, but the two parts of the building remained separate. The city issued a temporary certificate of occupancy and approved the work that had been done so far. (*Pettitt, supra,* 34 Cal.App.3d at pp. 816–817.)

Later, the plaintiffs finished the alterations, joining both parts of the building into a single commercial space. Two years later, a building inspector noted the additional work and demanded that the plaintiffs obtain a permit for it. After trying unsuccessfully to do so, the plaintiffs sought a writ of mandate. The trial court found that (1) the plaintiffs had bought the building in reliance on the city's erroneous written representation that *both* addresses had a nonconforming right of use of retail commercial and (2) they had spent money in reliance on the building permit authorizing use of the entire space for a commercial use. For those reasons, the court estopped the city from claiming that the initial permit violated the original zoning designation for part of the building and was invalid. (*Pettitt, supra,* 34 Cal.App.3d at pp. 817–818.)

On appeal, the court reversed. Citing similar cases where courts had declined to estop the government, the court concluded as a matter of law that the city could not be estopped from challenging "the validity of a permit or other representations respecting the use of property issued or made in violation of the express provisions of a zoning ordinance." (*Pettitt, supra,* 34 Cal.App.3d at p. 819.)

According to the court, such cases reflect "the thesis that estoppel will not be invoked against a government agency where it would defeat the effective operation of a policy adopted to protect the public." (*Pettitt, supra,* 34 Cal.App.3d at p. 822.) The court noted that zoning ordinances implicate "a vital public interest—not one that is strictly between the municipality and the individual litigant. All the residents of the community have a protectable property and personal interest in maintaining the character of the area as established by comprehensive and carefully considered zoning plans in order to promote the orderly physical development of the district and the city and

to prevent the property of one person from being damaged by the use of neighboring property in a manner not compatible with the general location of the two parcels. [Citation.] These protectable interests further manifest themselves in the preservation of land values, in esthetic considerations and in the desire to increase safety by lowering traffic volume. To hold that the City can be estopped would not punish the City but it would assuredly injure the area residents, who in no way can be held responsible for the City's mistake. Thus, permitting the violation to continue gives no consideration to the interest of the public in the area nor to the strong public policy in favor of eliminating nonconforming uses and against expansion of such uses. [Citations.]"[10] (*Pettitt*, at pp. 822–823; e.g., *Smith v. County of Santa Barbara*, *supra*, 7 Cal.App.4th at p. 775, and cases cited therein [despite company's costly reliance on county's errors in approving project and issuing permit, county not barred from revoking permit because estoppel would circumvent normal permit procedures]; *Chaplis v. County of Monterey* (1979) 97 Cal.App.3d 249, 259–260 [158 Cal.Rptr. 395] [given vital interest in public health, county not estopped to deny validity of erroneously issued septic permit].)

In *Fogerty, supra,* 29 Cal.3d 240, the plaintiffs owned the lands along the shoreline of Lake Tahoe, and many of them had built piers or docks extending to the low water line. They sought to prevent the state from claiming a public trust interest in land between high- and low-water marks in the lake. A majority of the Supreme Court characterized the issue as whether the state should be estopped from claiming such an interest and focused exclusively on whether estopping the state would nullify a strong rule of policy adopted for the benefit of the public. (*Id.* at pp. 247–249.)

The majority found that its decision would affect rights in "4,000 miles of shoreline along 34 navigable lakes and 31 navigable rivers, and many thousands of acres of land between high and low water (the shorezone)." (*Fogerty, supra,* 29 Cal.3d at p. 245.) It then noted that "[t]he shorezone is a fragile and complex resource," providing the environment necessary for the survival of numerous kinds of wildlife, including endangered species, and plants and "a gene pool for the preservation of biological diversity." (*Ibid.*) Moreover, "the shorezone in its natural condition" helped maintain water quality and acted "as a buffer against floods and erosion." (*Ibid.*)

---

[10] The court observed that the rule that estoppel will not be invoked to defeat a public policy "has also been invoked, recognized and approved in many California cases other than zoning where the public interest is vitally involved and outweighs the private injury," citing cases involving Health and Safety Code and Business Code violations, competitive bidding statutes, liquor licenses, and actions by the Insurance Commissioner. (*Pettitt, supra,* 34 Cal.App.3d at p. 822, fn. 5; see 13 Witkin, Summary of Cal. Law, *supra,* Equity, §§ 196 & 197, pp. 536–540, & cases cited therein.)

The majority further observed that "[t]he recreational use of these areas for picnicking, hunting, fishing, hiking, birdwatching and nature study does not require elaboration to any Californian. [Citation.] . . . 'There is a growing public recognition that one of the most important public uses of the tidelands—a use encompassed within the tidelands trust—is a preservation of those lands in their natural state, so that they may serve as ecological units for scientific study, as open space, and as environments which provide food and habitat for birds and marine life, and which favorably affect the scenery and climate of the area.' That observation is equally applicable to the shorezone." (*Fogerty, supra*, 29 Cal.3d at pp. 245–246, quoting *Marks v. Whitney* (1971) 6 Cal.3d 251, 259–260 [98 Cal.Rptr. 790, 491 P.2d 374].)

Next, the majority pointed out that the Legislature had recognized the value of the shorezone by enacting statutes calling for its protection. (See §§ 5093.50 & 5811.) "Section 5811 provides that 'the remaining wetlands of this state are of increasingly critical economic, aesthetic, and scientific value to the people of California, and . . . there is need for an affirmative and sustained public policy and program directed at their preservation, restoration, and enhancement, in order that such wetlands shall continue in perpetuity to meet the needs of the people.' " (*Fogerty, supra*, 29 Cal.3d at p. 246.)

The majority found that together, these considerations reflected a strong public policy in favor of a public trust in the shorezone because it would allow the state flexibility in determining the appropriate uses and protective measures for such land. (*Fogerty, supra*, 29 Cal.3d at p. 245.) Given the need to prevent deterioration and disappearance of this fragile resource, the majority concluded that the state should not be estopped from asserting a public trust interest in the shorezone. (*Id.* at p. 247.)

There is an equally strong public policy supporting the protection and preservation of our coast, and in the Coastal Act, the Legislature recognized the value of California's unique coastal resource and the need to preserve and protect it.

In *Yost v. Thomas* (1984) 36 Cal.3d 561 [205 Cal.Rptr. 801, 685 P.2d 1152], the court summarized the nature and purpose of the act. "The Coastal Act of 1976 [citation] was enacted by the Legislature as a comprehensive scheme to govern land use planning for the entire coastal zone of California. The Legislature found that 'the California coastal zone is a distinct and valuable natural resource of vital and enduring interest to all the people'; that 'the permanent protection of the state's natural and scenic resources is a paramount concern'; that 'it is necessary to protect the ecological balance of the coastal zone' and that 'existing developed uses, and future developments that are carefully planned and developed consistent with the policies of this

division, are essential to the economic and social well-being of the people of this state . . . .' (§ 30001, subds. (a) and (d))." (*Id.* at p. 565, fn. omitted; see *La Fe, Inc. v. Los Angeles County* (1999) 73 Cal.App.4th 231, 235 [86 Cal.Rptr.2d 217] [act designed to protect resources, maximize public access, and minimize alteration of natural land forms]; *South Central Coast Regional Com. v. Charles A. Pratt Construction Co.* (1982) 128 Cal.App.3d 830, 844 [180 Cal.Rptr. 555] [act represents "a major statement of overriding public policy regarding the need to preserve the state's coastal resources not only on behalf of the people of our state, but on behalf of the people of our nation"].)

Section 30251 provides, "The scenic and visual qualities of coastal areas shall be considered and protected as a resource of public importance. Permitted development shall be sited and designed to *protect views to and along the ocean and scenic coastal areas,* to minimize the alteration of natural land forms, to be visually compatible with the character of surrounding areas, and, where feasible, to restore and enhance visual quality in visually degraded areas. . . ." (Italics added.)

■ The Coastal Act provides heightened protection to ESHA's. (*Sierra Club v. California Coastal Com.* (1993) 12 Cal.App.4th 602, 611 [15 Cal.Rptr.2d 779].) Section 30107.5 identifies an ESHA as "any area in which plant or animal life or their habitats are either rare or especially valuable because of their special nature or role in an ecosystem and which could be easily disturbed or degraded by human activities and developments."

The consequences of ESHA status are delineated in section 30240, which provides, " '(a) Environmentally sensitive habitat areas shall be protected against any significant disruption of habitat values, and only uses dependent on those resources shall be allowed within those areas. [¶] (b) Development in areas adjacent to environmentally sensitive habitat areas and parks and recreation areas shall be sited and designed to prevent impacts which would significantly degrade those areas, and shall be compatible with the continuance of those habitat and recreation areas.' Thus development in ESHA areas themselves is limited to uses dependent on those resources, and development in adjacent areas must carefully safeguard their preservation." (*Sierra Club v. California Coastal Com., supra,* 12 Cal.App.4th at p. 611; accord, *Bolsa Chica Land Trust v. Superior Court* (1999) 71 Cal.App.4th 493, 506–507 [83 Cal.Rptr.2d 850].)

■ Unquestionably, the Coastal Act reflects " 'a strong rule of policy, adopted for the benefit of the public' " that implicate matters of vital interest.

(*Mansell, supra,* 3 Cal.3d at p. 493.) Simply put, the public has a vital interest in the protection and preservation of the California coast. It follows that when the Commission acts and issues orders in accordance with the Coastal Act, those actions and orders embody the policies of the Coastal Act and constitute rules adopted for the public benefit.

Here, the Commission found that the parcel is located in or adjacent to the Asilomar Dune complex, much of which is considered an ESHA because of its unique and indigenous flora, which also help stabilize the dune complex. The Commission found that in 1983, when the Bonannos sought a development permit, restoration and future preservation were necessary because the site had already become "severely altered through previous home construction," and the spread of aggressive ice plant was threatening "native plants on-site as well as in the general area." Indeed, the trial court specifically found that the parcel was in a "degraded" state before the easement and restrictions were imposed.

Under the circumstances, estopping the Commission because of its prior regulatory inaction would nullify otherwise valid restrictions adopted for the public benefit for as long as the Feduniaks own the property. Estopping the Commission does not punish the Commission. It would, however, injure the public, which has a strong interest in a scenic natural coastline with native vegetation, because it would indefinitely postpone the restoration of the site to that state, a restoration that has already been delayed for over 20 years. Although individuals may disagree over whether a pitch-and-putt golf course is more aesthetically pleasing than the natural geography and native vegetation of the California coast, the people of the state, acting through the Legislature, have unequivocally voiced a strong preference for the natural state of the coast and deemed it to be a valuable asset that must be protected, preserved, restored, and maintained, especially in ESHA's and areas adjacent to them.

Last, we recognize that unlike the circumstances in *Fogerty*, permitting the Commission to enforce its orders will not immediately affect thousands of miles of coastline and hundreds of property owners. However, estopping the Commission from enforcing otherwise valid restrictions on the property is akin to estopping the enforcement of zoning ordinances in *Pettitt*, which involved only one property owner. Moreover, applying estoppel because of

regulatory inaction could undermine the Commission's ability to enforce existing and future permit restrictions on property along the entire coast that the Commission has not been able to monitor for compliance.

With these considerations in mind, we turn to the trial court's analysis. The trial court perfunctorily acknowledged the strong public policy concerning protection of the coast but did not elaborate. On the other hand, it noted that (1) the property was in a "degraded" condition before the golf course was installed; (2) after installation, no one objected to it for over 18 years; and (3) it was not causing any "ongoing resource damage." The court further opined that the Feduniaks "persuasively argue[] that the property has never been in an Environmentally Sensitive Habitat Area [ESHA], nor adjacent to one."

We disagree with the court's analysis. The court devalued the strong public interest in the natural state of the coast and its native vegetation and in restoring it, where, as here, it had already become degraded by 1983. The court seems to have found that the golf course was an improvement that solved the previous degradation. However, the court ignored the fact that the golf course violated the applicable restrictions. Moreover, as a violation, the golf course itself represented ongoing developmental damage to the coast that continued to frustrate the public interest in having the parcel restored to its natural state. As noted, the trial court found that the Commission's findings were supported by substantial evidence, and one of those findings was that the unpermitted development of a golf course on the property represented "continuing resource damage."

The court's additional observation concerning the Feduniaks' claim concerning the initial ESHA designation is troublesome. Notwithstanding its finding that the Commission's orders were supported by substantial evidence and that it was too late to challenge the restrictions, the court apparently questioned the key finding on which the restrictions were based: The parcel is in or adjacent to the Asilomar Dunes ESHA. Because the court found the evidence of misdesignation "persuasive," the court apparently weighed misdesignation against the Commission and in favor of estoppel.

However, as the court correctly found, the period to challenge restrictions had long expired before the Feduniaks bought the property. (See § 30801 [challenges to Commission action must be brought within 60 days].) Thus, the parcel designation by the Commission was not properly subject to litigation or dispute before the court. In our view, therefore, it was inappropriate for the court to consider the propriety of that designation and substitute its findings for those of the Commission under the guise of balancing the equities for and against estoppel. In effect, the court allowed the Feduniaks to

use a claim of estoppel as a vehicle to weaken the enforceability of the easement and permit restrictions, in circumvention of the normal procedures for challenging them.

The Feduniaks argue that they were "innocent purchasers" of the property and should not be bound by the fact that the Bonannos did not challenge, and instead accepted, the easement and permit restrictions. However, the Feduniaks were "innocent" buyers only because the title company had failed to discover the restrictions before the purchase. In any event, once the period to challenge the restrictions had expired and they were recorded, they became immune from collateral attack by the original property owner *and successor owners*. (*Sierra Canyon, Co. v. California Coastal Com.* (2004) 120 Cal.App.4th 663, 668–669 [16 Cal.Rptr.3d 110]; *Ojavan Investors, Inc. v. California Coastal Com.* (1994) 26 Cal.App.4th 516, 524–527 [32 Cal.Rptr.2d 103].) Indeed, the court recognized that the Feduniaks could not challenge those determinations because the Bonannos had failed to challenge them.[11]

Having found that the easement and permit restrictions reflect a strong public policy adopted for the public benefit that would be substantially affected if the Commission were estopped, we focus on whether the injury to the Feduniaks is so great that justice demands that the Commission be estopped.

The only injuries to the Feduniaks identified by the trial court—and the only injuries claimed below were the cost of removing the golf course and the frustration of an expectation of beneficial enjoyment. However, the Feduniaks may have legal remedies against the Bonannos and the title company concerning the failure to disclose and find the recorded restrictions that could mitigate the cost of complying with the Commission's orders.

In any event, the cost burden cannot reasonably be considered injury or injustice because the Feduniaks offered the Commission an equivalent amount of money to pay for mitigation of damage elsewhere on the coast in lieu of removing the golf course. In other words, since the Feduniaks were willing to fund a restoration project of equivalent cost elsewhere in order to

---

[11] For this reason, we reject the Feduniaks' claim that the Commission's findings, and in particular the ESHA-related findings, are not supported by substantial evidence.

We also reject the argument of amicus curiae, the Pacific Legal Foundation, that the easement and permit conditions would be constitutionally suspect if they were imposed on a project today because they do not meet the takings standard established in *Nollan v. California Coastal Commission* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141]. Even if we accepted the legal premise of the argument—and we do not mean to suggest that it has any merit—we note amicus curiae concedes that the restrictions are valid and "it is far too late to make a collateral attack on the permit conditions. . . ." Thus, its argument is irrelevant.

keep their golf course, the real injury is that they would no longer be able to own, see, and use a private golf course uniquely situated on the California coast.

In this regard, we note that Mr. Feduniak testified that alternative remedies against the Bonannos and the title company for damages would not compensate for the loss of the golf course. He explained, "Our interest in this property was very, very predominately driven by our attraction to the unique and attractive and mature landscaping. And I don't see how any of the remedies that I believe have been referred to would enable us to continue to live in the property with that type of landscaping that has matured over a period of some two decades."

The trial court found that the injustice in depriving the Feduniaks the enjoyment of their golf course outweighed "any possible injury to the public should the landscaping remain." However, we conclude that this is not an " 'extraordinary case' " (*Toigo v. Town of Ross, supra*, 70 Cal.App.4th at p. 321), where justice demands that the government be estopped.

We are mindful of the very real impact that losing the future enjoyment of their private golf course and its landscaping will have on the Feduniaks and do not underestimate their personal loss. Nevertheless, their individual loss of enjoyment cannot outweigh the public's strong interest in (1) eliminating an ongoing unpermitted development, which violates applicable restrictions and has done so now for over 20 years; (2) finally restoring the area to its natural state and native vegetation; and (3) protecting the Commission's ability to enforce existing and future easement and permit conditions. Simply put, the Feduniaks' loss does not reasonably justify or compel estopping the Commission from enforcing its orders.

*Conclusion*

██ We have found that the record does not support three elements essential to the application of estoppel against the Commission in this case. Specifically, the evidence does not support a finding that the Commission knew or should have known that the golf course violated the easement and permit restrictions before the Feduniaks purchased Fan Shell Greens. It does not support a finding that the Commission intended for the Feduniaks to rely on its failure to enforce the restrictions over the years or that the Feduniaks reasonably could have believed that the Commission so intended its regulatory inaction. And it does not support a finding that the injustice to the Feduniaks without estoppel is of sufficient dimension to justify the effect upon public interest and policy that would arise if estoppel were applied.

Under the circumstances, therefore, we conclude that the trial court erred in estopping the Commission from enforcing its cease-and-desist and restoration orders.

### LACHES

The Feduniaks contend that the Commission should be barred from enforcing the restoration order under the doctrine of laches.

"Laches is an equitable defense based on the principle that those who neglect their rights may be barred from obtaining relief in equity. [Citation.] ' "The defense of laches requires unreasonable delay plus either acquiescence in the act about which plaintiff complains or prejudice to the defendant resulting from the delay." ' [Citation.] [¶] Laches is a question of fact for the trial court, but may be decided as a matter of law where, as here, the relevant facts are undisputed. [Citation.]" (*Bakersfield Elementary Teachers Assn. v. Bakersfield City School Dist.* (2006) 145 Cal.App.4th 1260, 1274 [52 Cal.Rptr.3d 486].)

The Feduniaks did not raise this claim below, and the court did not make any findings needed to apply it. "Generally, failure to raise an issue or argument in the trial court *waives* the point on appeal." (*Kolani v. Gluska* (1998) 64 Cal.App.4th 402, 412 [75 Cal.Rptr.2d 257].)

In any event, we reiterate that the Commission did not "acquiesce" in the easement violation that it did not know about before 2002; nor did it unreasonably delay enforcement of the easement thereafter. Moreover, as with estoppel, laches is not available where it would nullify an important policy adopted for the benefit of the public. (*In re Marriage of Lugo* (1985) 170 Cal.App.3d 427, 435 [217 Cal.Rptr. 74]; see *County of Los Angeles v. Berk* (1980) 26 Cal.3d 201, 222 [161 Cal.Rptr. 742, 605 P.2d 381] [considerations relevant to estoppel are applicable to laches]; e.g., *Wells Fargo Bank v. Goldzband* (1997) 53 Cal.App.4th 596, 628–633 [61 Cal.Rptr.2d 826] [despite delay in enforcement action, laches not available because it would nullify public·policy].)

Under the circumstances, the record does not support a laches defense against the Commission's enforcement action.

### ALTERNATIVE MITIGATION

The Feduniaks claim that the Commission's refusal to accept their offer to fund alternative mitigation elsewhere in lieu of removing the golf course was arbitrary and unreasonable. They argue that their property is not in an ESHA

or adjacent to one, and thus it was unreasonable as a matter of law· for the Commission· to insist on enforcing the easement instead of accepting their offer to fund restoration projects in properly designated ESHA's.

Again, the Feduniaks did not raise this claim below, and the trial court made. no findings on it.[12] Moreover, the claim is simply another attempt to collaterally attack the ESHA findings that were made by the Commission in 1983 and reiterated by the Commission after the hearing on the cease-and-desist and restoration orders, findings that the trial court found were supported by substantial evidence. Under. the circumstances, we. reject this claim.

## No State Interest

Last, the Feduniaks claim that because the Foundation did not accept the irrevocable offer of an easement until 1986, the installation of the golf course before that time did not violate "any contract or restriction created by the Commission . . . ."

Again, the Feduniaks waived this issue because they failed to raise it before the trial court. In any event, it lacks merit. The Commission correctly points out that the permit took effect immediately upon being issued. It specifically required submission of a restoration landscape plan that provided for the removal of all ice plants and "the revegetation of the lot with dune vegetation native to the Asilomar dunes." The permit further provided, "Unless waived by the Executive Director, a separate coastal permit shall be required for any additions to the permitted development."

The Bonannos submitted a landscape plan that conformed to. the permit conditions, which was approved. Thereafter, they modified the plan to add the installation of a golf course, comprising extensive areas of regular lawns, manicured putting greens, and sculpted sand traps, none of which reasonably can be considered "dune vegetation native to the Asilomar dunes." The Bonannos did not obtain, or even seek, a separate coastal permit for that addition to their initial landscape plan. Under the circumstances, therefore, the date that the Foundation formally accepted the easement dedication is irrelevant. The Commission obtained an interest in enforcing the landscaping restrictions as soon as the golf course was installed.

---

[12] The claim reiterates one conclusory statement in the Feduniaks' pleading below: "The Coastal Commissions [sic] refusal to accept the Petitioners [sic] offer of off-site mitigation to consider the Foundation's mitigation proposals was unreasonable."

## DISPOSITION

The judgment is reversed.

The Commission is entitled to its costs on appeal.

Premo, J., and Elia, J., concurred.

Respondents' petition for review by the Supreme Court was denied June 20, 2007, S152261. Baxter, J., Chin, J., and Corrigan, J., were of the opinion that the petition should be granted.